J-S34010-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| FRANKLIN RAY MARTIN, JR. | : | |
| | : | |
| Appellant | : | No. 1345 WDA 2017 |

Appeal from the Judgment of Sentence January 27, 2017
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s): CP-65-CR-0001664-2015

BEFORE: BOWES, J., STABILE, J., and STRASSBURGER*, J.

MEMORANDUM BY BOWES, J.:                    **FILED NOVEMBER 28, 2018**

Franklin Ray Martin, Jr. appeals from the judgment of sentence of twenty-five to fifty years imprisonment imposed following his jury trial convictions for, *inter alia*, rape. We vacate the judgment of sentence and remand for further proceedings pertaining to whether Appellant was deprived of the right to confront his accuser.

The victim in this case, M.K., was thirteen years old when the sexual abuse by Appellant began. M.K.'s mother, Amanda Martin, testified that she started dating Appellant in 2011 or 2012, and he moved into her residence sometime in 2012. The two married on July 27, 2013. M.K. informed the jury that the abuse started shortly after Appellant moved in. One day, Appellant asked for a backrub while Ms. Martin was at work. Afterwards, Appellant asked her to touch his penis. When she refused, Appellant grabbed her hand and put it on his penis. She ran to her bedroom and locked the door. About

_____
* Retired Senior Judge assigned to the Superior Court.

a month later, Appellant again asked her to touch his penis. When M.K. again refused, Appellant forced her to kneel and perform oral sex on him. Similar incidents with Appellant continued over the next two years, escalating to forcible vaginal penetration. Appellant threatened to kill her or her family if she told. The abuse continued unabated until approximately March of 2015, when she told Appellant that he had to stop as she had a boyfriend.

Around this same time, M.K. attempted to run away from home on at least two occasions. On March 12, 2015, Ms. Martin called the police to report M.K.'s absence. Sergeant Paul Manke of the New Kensington Police Department responded to the residence. Ms. Martin told him that M.K. had tried to run away about two weeks before, and suggested that she was headed to her boyfriend's house. Sergeant Manke located M.K. and transported her back home.

Ms. Martin testified that she asked M.K. what was going on, and M.K. showed her a series of text messages, sent by Appellant, indicating sexual contact. Ms. Martin told M.K. to leave, as Appellant would be home from work later that evening. Once Appellant arrived, Ms. Martin confronted him and asked, "have you been messing around with [M.K.]?" N.T., 8/1-3/16, at 171. Appellant reacted angrily, prompting Ms. Martin to take his cell phone. Ms. Martin called Sergeant Manke back, and he referred the matter to detectives for further investigation.

M.K. provided her cell phone to Detective Thomas Klawinski, and it was searched for text messages. The Commonwealth introduced a set of text

- 2 -

messages, dated March 12, 2015, between M.K. and a number listed as "dad."[1]  Detective Klawinski read the contents of those messages to the jury:

M.K.: What did you whisper in my ear last night?

Dad: What?  Don't call.  I hate talking on the phone plus everyone is sleeping.

Dad: I said you gotta make up your mind.  I can't keep doing this.  One day we are good, the next we ain't.

Dad: Um, hello?

M.K.: What is that supposed to mean?

Dad: The day before yesterday you were playing and all up on me, then yesterday you didn't even want a hug before bed.  I'm very confused.

M.K.: Well, I said I'm done.  I have a BF.  I don't wanna do it anymore.

Dad: So then, don't tease me.  No more touching, tickling, holding hands, poking, groping, nothing!

M.K.: I never did and you do the same.  Shit.

Dad: You were pushing your ass on me in the kitchen, pokin' my ass and grabbin' for my cawk.  Don't do that no more.

M.K.: No I wasn't.  Don't come onto me either.

Dad: Fine.  We are done.  I'm finished with it, too.  It was fun but I don't need you no more.

M.K.: You never needed me to begin with.

Dad: If it makes you feel better then keep telling yourself that.  You were the only thing keeping me home for a long time.  You were the reason I smiled in the mornings and slept good at night.

---

[1] Presumably, these were the messages that M.K. showed to her mother.

You were my sunshine and now you make me feel dirty and sick. I hope you heard me say I love you this morning. You won't hear it [sic] again.

*Id*. at 192-94.

Detective Klawinski did not execute any search warrants on Appellant's phone. On cross-examination, the detective admitted that the designation "dad" meant only that M.K.'s phone gave the corresponding phone number that label. The Detective conceded that the authorities did not link that phone number to Appellant.

Q. So I could have – I could take a cell phone and I can put Ken Noga and when I get a text message in from that particular number that I saved with it, it will show Ken Noga, correct?

A. That's correct.

Q. Is there anything about that information that tells you who owns that number or whose number that is?

A. There is a phone number. There is a phone number attached to dad.

Q. So did you get that phone number?

A. No, I did not. It was – the investigator would have probably talked to the girl who said, yeah, that's dad's number or that's the number I know my dad uses as the phone so I did not.

. . . .

Q. Now, in the course of your investigation, and you extract this data from the phone even though it says dad, there's a cell phone number associated with it, correct?

A. That's correct.

Q. You never checked who that cell phone number was listed with, correct?

A. That's correct, I did not.

*Id*. at 196-98.

The remaining direct evidence against Appellant was Ms. Martin's testimony that the two were "a little touchy-feely, sitting very close on the couch at different times," which led her to remark that "they acted more like they were married than him and I did." *Id*. at 166-67. Additionally, the Commonwealth presented the testimony of two jailhouse informants, who indicated that Appellant made incriminating comments while incarcerated.

Appellant was convicted and sentenced as indicated. Appellant filed a timely post-sentence motion on February 1, 2017, and the trial court issued a joint order/opinion disposing of the motion. Appellant timely appealed and complied with the court's order to prepare a Pa.R.A.P. 1925(b) statement.[2] Appellant raises the following points of error.

---

[2] The trial court did not rule on the motions within 120 days as required by Pa.R.Crim.P. 720(B)(3)(a). Pursuant Rule, the judge may grant one thirty-day extension for good cause shown. "If the judge fails to decide the motion within the 30-day extension period, the motion shall be deemed denied by operation of law." Pa.R.Crim.P. 720(B)(3)(b). The court purported to grant newly-appointed counsel multiple extensions to file amended motions. Counsel filed amended motions on July 17, 2017, which was 166 days after the initial motion was filed and therefore already outside the maximum 150 day period. The trial court therefore lacked authority to act on those motions.

As we noted in **Commonwealth v. Khalil**, 806 A.2d 415 (Pa.Super. 2002), we are powerless to extend the time for appeal. However, "we have held that we will address an otherwise untimely appeal if fraud or breakdown in the trial

[1]. Did the Commonwealth introduce sufficient evidence of the dates of his alleged crimes to sustain the convictions of Rape, Involuntary Deviate Sexual Intercourse, Sexual Assault, Aggravated Indecent Assault, Corruption of Minors, Unlawful Contact with Minors and Endangering the Welfare of Children?

[2]. Was [Appellant] deprived of due process and a fair trial when he was not provided notice or any discovery materials regarding a jailhouse snitch who would testify that he confessed to the crimes charged?

[3]. Did the sentencing court abuse her discretion in denying [Appellant]'s attempts to admit impeachment evidence of bias and interest of the victim falsely accusing another of similar sexual crimes and [Appellant] testifying against her?

Appellant's brief at 5 (reordered).

We address Appellant's sufficiency challenge first, as a successful challenge warrants discharge. *See Commonwealth v. Enix*, 192 A.3d 78, 80 (Pa.Super. 2018). Appellant presents two sufficiency challenges. The first broadly asserts that the Commonwealth failed to present sufficient evidence because it did not establish the date of his offenses. The second is narrower, and concerns the endangering welfare of a child charge. We readily dispose of both.

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a

court's processes resulted in an untimely appeal." *Id*. at 420. Since the court failed to deny the motions by operation of law as required, we will treat the appeal as timely filed.

reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Williams*, 176 A.3d 298, 305-06 (Pa.Super. 2017)

(citations and quotation marks omitted).

Starting with the global challenge, Appellant complains that M.K.

"testified that the sexual assaults upon her by [Appellant] started in 2012

without any more specificity as to the date or dates." Appellant's brief at 13.

In *Commonwealth v. Brooks*, 7 A.3d 852 (Pa.Super. 2010), we stated:

Case law has further "established that the Commonwealth must be afforded broad latitude when attempting to fix the date of offenses which involve a continuous course of criminal conduct." *Commonwealth v. G.D.M., Sr.,* 926 A.2d 984, 990 (Pa.Super.2007) (quoting *Commonwealth v. Groff,* 378 Pa.Super. 353, 548 A.2d 1237, 1242 (1988)). This is especially true when the case involves sexual offenses against a child victim. *Id.*

*Id.* at 857–58.

That circumstance is plainly involved herein. Moreover, M.K. testified

that the sexual acts started shortly after Appellant moved into her residence.

Therefore, Appellant was on notice of a time that the incidents were alleged

to have started, and his challenge fails.

Turning to the specific challenge to endangering the welfare of a child,

Appellant maintains that the Commonwealth failed to prove two elements of

the crime. The statute reads:

**(a) Offense defined.--**

(1) A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

(2) A person commits an offense if the person, in an official capacity, prevents or interferes with the making of a report of suspected child abuse under 23 Pa.C.S. Ch. 63 (relating to child protective services).

(3) As used in this subsection, the term "person supervising the welfare of a child" means a person other than a parent or guardian that provides care, education, training or control of a child.

18 Pa.C.S. § 4304.

Appellant argues that the Commonwealth failed to prove that he had a

duty of care or supervised the welfare of M.K. because he was not her father,

did not adopt her, and was merely married to M.K.'s mother. We agree with

the trial court's discussion of this issue, and adopt it as our own:

The Pennsylvania Supreme Court in **Comm. v. Lynn**, 114 A.3d 796, 824 (Pa. 2015), contemplated the definition of duty of care, and stated that the terms "'endangers the welfare of the child' and 'duty of care, protection or support,' are not esoteric; rather, we discerned that they are easily understood and given context by the community at large." **Id**. at 818. Also, it stated that "an individual who contemplates a particular course of conduct will have little difficulty deciding whether his intended act endangers the welfare of the child by his violation of a "duty of care, protection or support." **Id**. Indeed, as the Superior Court noted,

[in] an age when nontraditional living arrangements are commonplace, it is hard to imagine that the common sense of the community would serve to eliminate adult persons residing with a non-custodial child from the scope of a statute protecting the physical and moral welfare of children." ***Comm. v. Brown***, 721 A.2d 1105, 1107 (Pa.Super.1998).

Here, M.K. and Amanda Martin both testified that when Martin was working, [Appellant] was tasked with caring for the children at home and was the only adult in the residence. The jury, after hearing this testimony, determined that the Commonwealth had proven beyond a reasonable doubt that [Appellant]'s course of conduct violated a duty of care to care for M.K., and found [Appellant] guilty at Count 12.

Trial Court Opinion, 8/30/17, at 20-21. We agree that the Commonwealth presented sufficient evidence to sustain the jury's finding.

Appellant's second argument is that he was denied due process when the Commonwealth failed to provide notice that a jailhouse informant would testify. As a result, he was deprived of the opportunity to find and produce evidence demonstrating that he and the informant never met.[3] As the Commonwealth notes, Appellant failed to raise this issue at trial and it is therefore waived. ***See*** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Before addressing Appellant's third issue, we note that Appellant has attempted to present an argument regarding whether the text messages were

---

[3] Appellant does not say that such evidence actually exists, only that he did not have enough time to search for it before trial. Moreover, trial counsel withdrew from the case and did not handle the appeal; counsel may well have been aware that the Commonwealth intended to call the witness.

properly authenticated. "Text messages introduced at trial were not properly authenticated and were not proven beyond a reasonable doubt to have been sent by the Defendant[.]" Appellant's brief at 14.

This issue is waived for two reasons. First, this question does not appear in his statement of questions presented. *See* Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."). Second, authentication is governed by Pa.R.E. 901, and while the Commonwealth as proponent of the evidence bore the burden of establishing authenticity, Appellant did not lodge any objection to the testimony of Detective Klawinski regarding the text message contents. Additionally, the Commonwealth moved to admit an exhibit that was a report listing all the text messages, and Appellant stated, "We have no objections." N.T., 8/1-3/16, at 191-92. As stated in *Folger ex rel. Folger v. Dugan*, 876 A.2d 1049 (Pa.Super. 2005), the failure to invoke Rule 901 as a basis to exclude such evidence results in waiver:

> Our own review of the record does not reveal any point at which Appellants raised an issue under Rule 901. Rather, Appellants challenged the reliability of the [scientific] test results as reflected in the records of St. Christopher Hospital and the admissibility of the [scientific] test results under the hearsay rules. Since Appellants did not object to the admissibility of the records under Rule 901 at trial, they have waived that argument for purposes of appeal.

*Id*. at 1055 (Pa.Super. 2005) (citation omitted).

We now address the remaining claim, which concerns Appellant's constitutional right to confront his accuser. He argues that the trial court

- 10 -

impaired that right by refusing to permit the introduction of certain evidence relating to the history of this case. The trial court excluded the evidence as irrelevant. We generally apply an abuse of discretion review to such questions:

> The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. In determining whether evidence should be admitted, the trial court must weigh the relevant and probative value of the evidence against the prejudicial impact of the evidence. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact.

***Commonwealth v. Antidormi***, 84 A.3d 736, 749 (Pa.Super. 2014). However, where the admission of evidence turns on a question of law, we apply a *de novo* standard. ***See Commonwealth v. Woeber***, 174 A.3d 1096 (Pa.Super. 2017). A claim that the accused's confrontation rights were violated by an impermissible limitation of cross-examination presents a question of law. ***Id***.; ***Commonwealth v. Palmore***, ____ A.3d ____, 2018 WL 4214202 (Pa.Super. September 5, 2018) ("To the extent that these questions raise Confrontation Clause issues, our standard of review is de novo and our scope of review is plenary.").

The following additional facts are germane to our review. M.K.'s accusations resulted in the initiation of criminal charges against Appellant on March 19, 2015. At that time, criminal charges were pending against M.K.'s

- 11 -

cousin, Steffon Kilgore. Those charges, filed on September 17, 2013, alleged that Kilgore raped M.K. The matter proceeded to a jury trial, and Kilgore was acquitted at all counts on August 5, 2015. Appellant testified on Kilgore's behalf, and apparently indicated that he helped M.K. concoct the charges.[4]

The timing of that sequence of events is significant to the parties' arguments. Appellant was incarcerated on the instant charges in March of 2015, and, five months later, he testified at Kilgore's trial. According to the Commonwealth, Appellant's willingness to testify on Kilgore's behalf manifested itself only after he was accused of these crimes. Appellant, on the other hand, asserted that his intention to testify against M.K. prompted the accusations against him. The Commonwealth filed a motion *in limine* seeking to bar any mention of the accusations against Kilgore. The cited basis for preclusion was the Rape Shield, which states:

> **(a) General rule.**--Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.
>
> **(b) Evidentiary proceedings.**--A defendant who proposes to offer evidence of the alleged victim's past sexual conduct pursuant to subsection (a) shall file a written motion and offer of proof at

---

[4] Nothing regarding Kilgore's case is included in the certified record, and Appellant simply notes the docket number. The relevant dates come from that publicly-available document. What Appellant testified to at that trial was discussed during pre-trial proceedings in this case, as quoted in the body *infra*.

- 12 -

the time of trial. If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an *in camera* hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

18 Pa.C.S. § 3104.

The trial court addressed the motion immediately prior to trial. "[N]ow we will address the Commonwealth's motion *in limine* regarding evidence of victim's -- pursuant to the Rape Shield." N.T., 8/1-3/16, at 13. Appellant argued that the Kilgore accusations were admissible on cross-examination of the victim, and also provided a basis to question the Commonwealth's expert. We quote at length the relevant exchange.

> THE COURT: First of all, the defense has not filed any motions with the court. I don't know if the defense intended to attempt to introduce anything of the victim's past sexual conduct so I assume you were not since you haven't presented anything to me?
>
> MR. ASTON: It's an interesting dilemma that we find ourselves in, Your Honor. What we are attempting or believe that she would be permitted to do is introduce evidence of a prior case involving this victim wherein she made allegations against another person and, in fact, there was a trial and that person was acquitted of it. It is not to impune [*sic*] her reputation or anything like that. **It deals with a cross-examination of both the victim and the notice of the intent to present expert testimony** that we have received in reference to this case. That deals specifically with Carol A. Hughes, who I assume is going to testify as she did in a previous trial about how victims typically act in cases of a sexual nature, delay in reporting, it's often in secret with no witnesses, the person is uncomfortable.
>
> There is a case, You Honor, of [**Commonwealth v. Fernsler**, 715 A.2d 435 (Pa.Super. 1998)], wherein the court says that we have recognized that the exposure of a witness' motivation in testifying is proper and an important function of the constitutionally protected right to cross-examination. **Fernsler** case, Your Honor,

- 13 -

the Superior Court overturned a conviction and sent it back for a new trial, a case wherein the trial court prohibited the very same kind of factual scenario that we have here because they said if you could show a bias, because Rape Shield is meant to protect the defense from trying to slander or impune [*sic*] the reputation, but if there is some other legitimate reason the Rape Shield doesn't apply.[5]

What our argument is and the defense in this case is, that this is all fabricated. It's all fabricated by this young lady. The fabrication occurs partially because our client testified in the first trial and he indicated in that testimony that he coached and taught her how to testify in that trial against the first person, and then lo and behold she has this boyfriend she is trying to run off with.

THE COURT: Let me just stop you here because you're confusing me a little bit, keeping in mind I only know from what I have read in the Affidavit. I haven't handled any of the pretrial matters in it.

It was my understanding that when there was another case involving another defendant and your client testified for the defense in that case –

MR. ASTON: Correct.

THE COURT: -- that your client had already been charged in this case. Your client was actually incarcerated on this case when he testified for the defense in that other case, is that correct?

MR. ASTON: It is correct but the timing of the two cases are interesting, at least to the defense, Your Honor, because in the first case the incidents are alleged to have occurred from here to here and then the victim is also alleging that our client then

---

[5] Appellant misstated **Fernsler**. That case was a Commonwealth appeal from an order denying its motion *in limine* to exclude. Therein, the child victim had committed a sexual assault against his half-sister and was required to participate in a treatment program. During his treatment, the victim stated that Fernsler had sexually assaulted him, leading to Fernsler's prosecution. Fernsler's theory was that the victim made the statements to help his rehabilitation, and noted that the Commonwealth retained the right to file charges against the victim had he failed to complete the program. He therefore sought to introduce the victim's own sexual assault. We affirmed.

perpetrated these abuses against her from age 13, which overlaps the first case onward.

THE COURT: How is that relevant?

MR. ASTON: Our argument is it's relevant because when you start looking at the accusations of the two cases she talks in the first case about how this had been going on for a period of time and yet she only describes three particular instances. In this particular case she says –

THE COURT: For defendant no. 1?

MR. ASTON: Yes. Now for our case she says it occurs from age 13 until age 15 but in reading through everything, all the police reports and everything, she only talks about again [*sic*] about three particular times. The Commonwealth is going to call Ms. Hughes to talk about all of this stuff about how sexual victims act, but our argument is but wait a minute, this young lady is meeting with this assistant district attorney, police officers, Children's Bureau workers and everybody like that for case no. 1 while case no. 2 is allegedly being perpetrated by our client who is the one who brought the information forward about case no. 1 to the mother. That fabrication overlaps and Carol Hughes's testimony I think makes fair game asking, but wait a minute, this isn't the typical sexual abuse case where you have a person who is isolated, not around –

THE COURT: I understand your argument.

*Id*. at 13-18 (footnote added). The judge then asked the Commonwealth to set forth what Carol Hughes would testify to. The prosecutor responded that she would explain the reasons for nondisclosure, and argued that the Kilgore case was irrelevant because M.K. still lived with Appellant after accusing Kilgore. The Commonwealth concluded: "I just think the testimony regarding the other case, even though it was a not guilty—," at which point the trial court interjected:

- 15 -

THE COURT: Let me just tell everybody right now, that doesn't matter a bit to me because I don't know why that person was acquitted. The fact that the person was acquitted does not mean that it never happened.

MR. ASTON: And we concur with the court on that.

THE COURT: Maybe it didn't but the fact that he was acquitted, that doesn't enter into my decision one bit.

MR. ASTON: No.

THE COURT: **That would be highly prejudicial to the Commonwealth and this trial if that were allowed to come in that she accused somebody else.** Anybody familiar with those types of cases, as I am certainly familiar from my years as a trial judge and my years as a prosecutor handling these types of cases, is that oftentimes a victim is victimized. This is the perfect victim so person A sexually abuses this victim and then person B, hey, this is an easy mark, I'm going to sexually abuse this person . . .

Again, I don't know what happened in the other case. I did not preside over that trial. I have no idea what happened. I'm here now because she is alleging that her stepfather sexually abused her for a period of years and I want to make sure that both sides get a fair trial.

It seems to me with all due respect, Mr. Aston, and I know you have to do your best to defend your client, is that it would tarnish the victim's credibility for you to bring in the fact that she had reported someone else had sexually abused her and the authorities were looking into that or starting prosecution and she is living with her stepfather that she has a relationship, a family relationship with and didn't report him. To me there is no reason. There is no collateral issue.

MR. ASTON: I just don't know if the court misspoke when the court articulated the reason why this has to be allowed in. When you said that it will impune [*sic*] upon her credibility. That credibility on the right to attack the credibility, a right to confrontation, it's constitutional.

> THE COURT: No, you're going to try to. I think you're attempting to so I did misspeak if I said it would. You are attempting to do that. I don't think it's an appropriate way to attempt to do that . . .

*Id*. at 23-26 (emphasis added).

Shortly thereafter, the Commonwealth repeated its position that the Kilgore evidence implicated the Rape Shield. The trial court correctly noted that the evidence was not subject to that statute, but, following further discussion, ruled that Ms. Hughes could not be cross-examined regarding M.K.'s failure to report Appellant despite her participation in the investigation regarding Kilgore. Counsel then argued:

> MR. ASTON: What if my client takes the stand, Your Honor, and testifies about how he coached her in the first case and how this is retaliatory because he already testified?
>
> THE COURT: This is retaliatory? Don't even answer this. The charges were brought against your client. Your client was in prison awaiting trial on this matter when the other person that she alleged abused her went to trial and then your client who was awaiting trial on allegations of sexually abusing this child, his stepdaughter, then went into another courtroom, not my courtroom, and testified that he coached her in order to convict the other person. I did not let that information in. I don't know. I did not preside over that trial. I know only what you attorneys told me. Absolutely that is not coming in. The charges were already brought against your client.
>
> Now, if your client – let's say hypothetically that she made allegations against the previous defendant and never made an allegation against your client, and then that client, that defendant, was in trial and your client never having been charged went in and testified to what you're telling me he did and then she made these allegation, then you might have some argument with me. This is not relevant the fact that your client who was awaiting trial on allegations of sexually molesting a child, his stepdaughter, testified for another defendant. No, there's no way that's coming in.

- 17 -

MR. ASTON: If I may, Your Honor, this case began when my client and the mother reported her as a runaway for being with her boyfriend, they bring her back, some of the allegations start to come out but nothing is really happening and then it came out that he was going to be a witness for the defense in the first case and that's when he lands down at the jail, the charges are filed.

THE COURT: **The district attorney is shaking her head.** I'll let you respond in a minute, Ms. Calisti.

. . . .

MS. CALISTI: Your Honor, **the Commonwealth did not discover this until after he was incarcerated.** Actually, I think it was very close to going to trial that he was going to testify for her.

THE COURT: No, but he is trying.

MS. CALISTI: He is trying to say that is why she made it up. **Nobody knew [Appellant] was going to testify for Steffon until after the arrest**.

THE COURT: Until after whose arrest?

MS. CALISTI: After his arrest, after she disclosed.

THE COURT: That's what I'm saying. I think we covered it all.

MR. ASTON: Yes, we have our parameters, Your Honor.

*Id*. at 32-35 (emphases in original).

We now quote the trial court's resolution of this claim as set forth in its

Pa.R.A.P. 1925(a) opinion:

While [Appellant]'s counsel averred that M.K.'s allegations affected her credibility as a witness, as the individual was eventually found not guilty at trial, such evidence had no bearing on [Appellant]'s guilt and was irrelevant to the instant case. Victim's statement that she had been sexually assaulted by a separate individual did not make it more or less likely that [Appellant] engaged in sexual intercourse with Victim in this case.

Moreover, the fact that another perpetrator had been acquitted does not mean that the victim lied. A jury may believe that a defendant committed a crime, but does not find evidence beyond a reasonable doubt. For these reasons, the evidence was not relevant, and was properly excluded.

Trial Court Opinion, 8/30/17, at 25-26.

Preliminarily, we note that the trial court correctly ruled that this proposed evidence, while involving sexual conduct, is not governed by the Rape Shield law. In **Commonwealth v. Johnson**, 638 A.2d 940 (Pa. 1994), our Supreme Court held that "the Rape Shield law does not prohibit the admission of evidence regarding a prior sexual assault suffered by the victim[.]" **Id**. at 941. The **Johnson** Court reasoned that the purpose of the statute "is to prevent a sexual assault trial from denigrating into an attack upon the victim's reputation for chastity." **Id**. at 942. However, "[e]vidence that [the victim] had been subject to a previous sexual assault would not reflect upon [the victim]'s reputation for chastity. To be a victim is not 'conduct' of the person victimized." **Id**.

The same is true herein. Evidence that M.K. was previously raped by Kilgore is not "conduct" covered by the statute. Since the statute does not apply, our precedents direct that normal relevancy principles apply. **Id**. ("The question then becomes whether the testimony is relevant and material under the traditional rules of evidence."). The trial judge correctly focused on the fundamental evidentiary question of relevancy.

The trial court opinion remarks that the proposed cross-examination was properly excluded as irrelevant on the basis of *Commonwealth v. Holder*, 815 A.2d 1115 (Pa.Super. 2003), which examined the admissibility of sexual accusations against an individual other than the appellant. We disagree that *Holder* justifies the instant ruling, as the case is readily distinguishable.

In *Holder*, the victim reported that Holder had raped her in her apartment. Holder intimated that the victim had wanted to be with him, as she had not closed her door when Holder left her apartment. She replied that she did not think she had anything to fear, as Holder was a friend of her friend Michael Hunter. The victim stated that she knew Hunter for eight years and felt comfortable with Holder on the grounds that Hunter would not put her in harm's way.

Holder proffered that Hunter would testify that the victim had accused Hunter of rape approximately one week before the Holder incident. He argued that the evidence established that the victim did not, in fact, trust Hunter, which discredited her testimony that she likewise trusted Holder. The trial court ruled that the evidence was inadmissible pursuant to the rape shield as well as hearsay rules. *Holder* determined that the issue was a collateral matter. "That possible rape by Michael Hunter [does not bear] on the issue of appellant's alleged rape[.]" *Id*. at 1120. Additionally, we deemed the evidence irrelevant. *Id*. at n.2 ("Further, we fail to see how testimony that [the victim] thought that Michael Hunter may have raped her would make her

allegation of appellant's rape more or less likely. It was also inadmissible because it was not relevant.").

This case would be aligned with **Holder** had Appellant simply wished to introduce the fact that M.K. previously accused another individual of rape, with no further explanation as to how that evidence impacted the case against Appellant.[6]  However, Appellant did not intend to introduce the evidence for that purpose, but to establish that his testimony on Kilgore's behalf supplied a motive for M.K. to falsely accuse Appellant, *i.e.*, revenge.  That circumstance is not present in **Holder**, and to the extent that the trial court interpreted **Holder** to prohibit prior accusations against other individuals as collateral and/or *per se* irrelevant, it erred.

The relevancy analysis is fairly straightforward if one assumes that Appellant's version of the timing is true, with M.K. accusing Appellant after Appellant decided to testify on Kilgore's behalf.  Viewed that way, the evidence is clearly relevant and could be excluded only if:

> its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Pa.R.E. 403.

---

[6] We note that Appellant did not preserve any claim that the evidence was admissible on the grounds that the accusations against Kilgore were actually false.  As quoted *supra*, Appellant agreed with the trial court that the jury's acquittal is not equivalent to a finding of falsity.

There is little doubt that injecting the issue of a criminal trial involving a completely different defendant, but the same victim, could cause unfair prejudice, confuse the issues, or mislead the jury. That is especially so where Appellant presumably wished to inform the jury that the other trial involved rape, even if he agreed that the actual result of the proceedings was inadmissible. Since we may affirm on any basis supported by the record, our analysis might end there. But here the confrontation clause to the Sixth Amendment enters the equation.

> The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, means more than being allowed to confront the witness physically. Indeed, the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. Of particular relevance here, we have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.

*Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986) (cleaned up).

In *Davis v. Alaska*, 415 U.S. 308, 313–14 (1974), the United States Supreme Court held that the right of confrontation was violated when the trial court prohibited cross-examination into potential bias or motive. Therein, a safe was stolen from a bar and discovered on property twenty-six miles away. Richard Green, the juvenile stepson of the property owner, told police that he saw two black men standing near where the safe was recovered. The next day, investigators brought him to the police station and showed him six

pictures of black men. Green identified Davis, and later testified against him at trial.

Defense counsel attempted to introduce evidence that Green was on probation after having been adjudicated delinquent of burglary. Counsel stated that he did not intend to use the evidence to establish Green's character, but instead to show bias and prejudice, as Green may have identified Davis to "shift suspicion away from himself as one who robbed the Polar Bar," or provided information based on a fear of probation revocation if he did not cooperate to the police's satisfaction. *Id*. at 311. The trial court granted the prosecution's motion for a protective order, which was based on an Alaskan rule prohibiting admission of juvenile dispositions in such situations.

The Supreme Court found a deprivation of the right to confront. With respect to Alaska's argument that its policy interest as expressed in the rule justified a limitation of that right, the Court recognized the importance of that interest but it could not "require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness," in part because the State could have taken a less restrictive approach by not using Green as a witness.[7] The High Court has cautioned, however, that the defendant's right of confrontation is not absolute.

---

[7] That alternative was not, of course, available to the Commonwealth herein.

It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

**Van Arsdall**, **supra** at 679.

In **Commonwealth v. Wall**, 606 A.2d 449 (Pa.Super. 1992) we extensively explained how the Rape Shield Law seeks to ensure that the fact-finding process is not waylaid by prejudicial and irrelevant matters, while simultaneously respecting the right of confrontation:

The search for the truth, therefore, is a common bulwark upon which both the Rape Shield Law and the Confrontation Clause are built. Thus, in many cases, the intent of both the Rape Shield Law and the Confrontation Clause may be advanced without encroaching upon the other's domain. We must recognize that the defense attorney who kindles the "great engine of cross-examination" to harass or embarrass the victim/witness does so to conceal rather than unveil the truth. Nothing within either the terms or the history of the Confrontation Clause could in any way be interpreted to protect such misguided defense strategy, and thus the operation of the Rape Shield Law in such a case remains unhindered. This is true, in fact, whether or not an obfuscation of the truth determining process is actually intended. Even incidental prejudice may be sufficient to exclude facts from trial which bear lightly if at all on the ultimate issues without violation the Confrontation Clause . . . .

. . . .

It is only where the truth determining process is not forwarded by the exclusion of past sexual history that the Rape Shield Law and the Confrontation Clause may not be reconciled. Under these relatively rare circumstances, as this Court has previously recognized, "Rape Shield laws, if rigidly construed, could

- 24 -

impermissibly encroach upon a defendant's right to confront and cross-examine witnesses which is secured by the United States and Pennsylvania Constitutions." In such rare cases "the Rape Shield Law must bow to the need to permit an accused an opportunity to present genuinely exculpatory evidence...."

The difficulty is of course in determining when the truth determining process is sufficiently affected by the application of the Rape Shield Law. In Pennsylvania, we have come to resolve this question through a relatively elaborate procedure which is designed to ensure that no evidence of the victim's sexual history is introduced *unless* and *until* it can be established that to exclude such evidence would lay victim to the very *raison d'etre* of the trial itself: the pursuit of truth. The process begins with the defendant submitting a *specific* proffer to the court of exactly what evidence he or she seeks to admit and precisely why it is relevant to the defense. This procedure forces the defendant to frame the precise issues and interests involved, and prevents him or her from embarking upon "fishing expedition style intrusions on Rape Shield law protections." Where the proffer is but vague and conjectural, evidence of the victim's past sexual conduct will be excluded and no further inquiry need be entertained.

Where the proffer is sufficiently specific, the court must then undertake a three part analysis of the substance of the proffer. At the trial level, the court must conduct an *in camera* hearing at which they must determine: 1) whether the proffered evidence is *relevant* to the defense at trial; 2) whether the proffered evidence is *cumulative* of evidence otherwise admissible at trial; and 3) whether the proffered evidence is more probative than prejudicial. On appeal, such evidentiary rulings must be offered due deference and overturned only where there has been an abuse of discretion. Where, however, the proffered evidence excluded by the Rape Shield law is relevant, non-cumulative, and more probative of the defense than prejudicial, it must be admitted.

*Id*. at 456-57 (citations omitted, emphases in original).

This analysis speaks to evidence that is actually covered by the Rape Shield law. Here, as noted, the trial court correctly determined that M.K.'s accusation of Kilgore was not subject to that statute. Hence, the

aforementioned balancing afforded by the statute *vis-à-vis* a defendant's Confrontation Clause rights, particularly the "relatively elaborate procedure which is designed to ensure that no evidence of the victim's sexual history is introduced *unless* and *until* it can be established that to exclude such evidence would lay victim to the very *raison d'etre* of the trial itself," **id**. at 457, is not applicable.

Recognizing that the Rape Shield Law is inapplicable, and the accompanying recognition that Appellant had an interest in presenting evidence of M.K.'s possible motive to lie, arguably compels granting Appellant a new trial with no further inquiry insofar as an erroneous deprivation of the right to confront a witness is, in some cases, not harmless error. **Van Arsdall**, **supra** at 684 ("The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt.").[8] Viewing the Rape Shield as a legislative enactment announcing a strong policy interest that justifies a weighing of the right to confrontation suggests that

---

[8] We decline to find that any error in foreclosing inquiry into the Kilgore matter was harmless beyond a reasonable doubt. The text message evidence significantly undercuts Appellant's claim that M.K. is fabricating the evidence, but as we set forth in the factual summary, the Commonwealth failed to connect the phone number to Appellant. Thus, this case was reduced to a question of credibility.

the balance may tip in the accused's favor in this situation since the law does not cover this conduct.[9]

We decline to go so far, and we find that a remand for an evidentiary hearing is warranted. That course is not unprecedented, as illustrated by our decision in **Commonwealth v. Woeber**, 174 A.3d 1096 (Pa.Super. 2017). Therein, the then-fifteen-year-old victim A.R. stated that, when she was twelve, she was at the home of her friends La. and Li., Woeber's daughters, for a birthday party. A.R. stated that Li. gave her a drink with alcohol, and at some point during the party A.R. was attacked by two boys who tried to pull off her clothes. Woeber stopped the attack, and raped her shortly afterwards.

Woeber and his daughters moved to Alaska for approximately six months, and then returned to Pennsylvania. A.R. resumed her friendship with the girls, and attended a second party where Woeber again raped her. On cross-examination of A.R., counsel's questioning implied that A.R. told La. that the other boys had raped her during the birthday party.

> At that point, the prosecutor objected, claiming rape shield. A sidebar discussion followed, during which Appellant's counsel explained his intention to call La. to testify that—following the

---

[9] Despite the rape shield statute's inapplicability to this evidence, the same constitutional weighing concerns inherent in such laws naturally extend to this type of evidence. As the Supreme Court of West Virginia observed, "[S]tatements about sexual activity involving an alleged victim which are not false are evidence of the alleged victim's sexual conduct, even though such conduct was involuntary—and such evidence is *per se* within the ordinary scope of rape shield laws." **State v. Quinn**, 490 S.E.2d 34, 39–40 (W.V. 1997).

- 27 -

Woeber family's return from Alaska—"[A.R.] had said to her, you know, 'Something happened at this party at your house,' and that she said, 'I was raped by two other boys.'" [Woeber]'s counsel contended that A.R. was accusing someone else of committing the rape that she accused [Woeber] of committing on the night of Li.'s party. He also argued that rape shield was inapplicable because it was not A.R.'s sexual conduct at issue but, rather, a prior sexual assault.

The trial court announced a recess and continued the discussion with counsel in open court. The trial court advised Appellant's counsel that advance notice of the issue would have been appreciated so that the trial court could have conducted an *in camera* hearing as required by ***Commonwealth v. Black***, 337 Pa.Super. 548, 487 A.2d 396 (1985). ***See also*** 18 Pa.C.S.A. § 3104(b). [Woeber]'s counsel responded that his review of the law indicated that he was not presenting a rape shield issue but an issue of credibility. The trial court responded that the question was "close to the line" and that counsel should have made a proffer that would have led the court to hold a § 3104(b) evidentiary hearing. The court cited ***Commonwealth v. Fink***, 791 A.2d 1235 (Pa. Super. 2002), for the proposition that prior sexual conduct involving a prior sexual assault does not trigger the Rape Shield Law and that the evidence is to be evaluated under general evidence admissibility criteria. However, the court again noted that counsel should have made a proffer to the court so the court could determine whether rape shield applies.

The prosecution argued the defense was engaged in a veiled attempt to pierce the Rape Shield Law. The court announced its intention to sustain the objection, strike the question from the record, and leave it up to the defense to question La. in its case-in-chief. The prosecution could then call A.R. on rebuttal to affirm or deny the allegation.

At that point, for reasons unrelated to the case, the trial court dismissed the jurors for the day. When the trial court met with counsel the following morning, further discussion ensued regarding rape shield. The trial court noted that, based on the understanding that the statement concerning the rape by two boys referred to events on the same night A.R. claimed Appellant assaulted her, "it is highly probative with regard to credibility and not excluded by rape shield."

- 28 -

The prosecution complained that there were no interviews with A.R. addressing her alleged conversation with La. The trial court reiterated that a § 3104(b) motion *in limine* should have been filed so that the issue could have been resolved following an *in camera* hearing. Ultimately, the trial court determined that the objection would be sustained, cross-examination of A.R. would continue, and the issue would be addressed again if it came up during the defense case.

*Id*. at 1101–02 (footnote and citations to transcript omitted).

We agreed that the proposed evidence was not implicated by the Rape Shield, and determined that the court erroneously sustained the objection. The remedy was an evidentiary hearing.

[W]e find the court committed an error of law by sustaining the Commonwealth's objection during cross-examination of A.R., and erred by failing to evaluate the evidence concerning A.R.'s statement under traditional evidentiary rules. Had it done so, the court would have had the opportunity to consider whether the evidence made it less likely that Appellant assaulted A.R. As a result of the court's error, there is nothing in the record to suggest that A.R. told La. that two boys raped her at Li.'s party, other than the sidebar statement made by Appellant's counsel. Further, there is nothing of record to suggest that La. would testify that A.R. claimed two boys raped her.

We find the trial court erred by sustaining the Commonwealth's objection. In doing so, the trial court violated Appellant's confrontation rights because it barred the cross-examination of A.R. about a prior statement implicating assailants other than [Woeber]. In addition, it put [Woeber]'s counsel in the position of trying to raise the issue in the defense case-in-chief without a foundation for doing so and in the face of inevitable hearsay objections. Therefore, we are compelled to vacate Appellant's judgment of sentence and remand for a hearing.

As for the proceedings on remand, we find guidance in this Court's decision in *Commonwealth v. Eck*, 413 Pa.Super. 538, 605 A.2d 1248 (1992), a case in which the appellant claimed his confrontation rights were violated by the court's decision to withhold materials relating to his accuser. Because the trial court

had not placed on the record any findings or conclusions relating to its *in camera* review of the records, we directed on remand that the trial court conduct *in camera* proceedings after which the trial court could grant a new trial or reinstate the judgment of sentence. ***Id.*** at 1256. Our Supreme Court adopted this procedure in **Commonwealth v. Ruggiano**, 611 Pa. 368, 26 A.3d 473 (2011) (*per curiam*) (citing **Eck**). In **Ruggiano**, as in the case before us, the victim's past sexual conduct was not at issue. Therefore, the Rape Shield Law does not apply and the trial court must determine whether the evidence sought to be admitted as to A.R. is admissible under the traditional rules of evidence. ***Id.*** (citing **Johnson**, 638 A.2d at 942).

Accordingly, we direct the trial court on remand to conduct *in camera* proceedings for the limited purpose of determining whether A.R. would deny telling La. that two boys raped her at Li.'s party and whether La. would testify that A.R. made such a statement. In the event the trial court finds A.R. and/or La. would offer such testimony, the court should then consider whether that testimony is admissible under traditional evidentiary rules. If the testimony is admissible, the trial court shall grant a new trial and permit cross-examination of A.R. concerning the purported statement. If A.R. denies making the statement and La. denies that A.R. claimed she was raped by other assailants, or if the trial court determines their testimony is inadmissible, the trial court shall reinstate the judgment of sentence.

***Id***. at 1104–05.

The trial court in **Woeber** committed the same type of error by foreclosing a potential avenue of cross-examination without adequate justification. Notably, **Woeber** determined that a remand for further proceedings was warranted despite the facial inapplicability of the Rape Shield. Furthermore, **Woeber** demonstrates that a defendant is not entitled

to a new trial simply because he was precluded from receiving an answer to a question.[10]

As in ***Woeber***, we find that the proposed evidence is plainly probative, but it is equally plain that the evidence, if entirely unsupported, could prejudice the very truth-finding process that undergirds our jury system. Taken together, we think that the critical question is this: Is there any evidence to support the claim that M.K. knew, suspected, or had reason to know or suspect, that Appellant intended to testify on behalf of Kilgore prior to the accusations?[11] If so, Appellant is entitled to a new trial and may impeach M.K. on those grounds. If not, the judgment of sentence must be reinstated. ***See id***.

We note that Appellant alluded to this point, but the trial court rendered a factual finding on that point without the benefit of a hearing.

> MR. ASTON: If I may, Your Honor, this case began when my client and the mother reported her as a runaway for being with her boyfriend, they bring her back, some of the allegations start to come out but nothing is really happening and then it came out that he was going to be a witness for the defense in the first case and that's when he lands down at the jail, the charges are filed.

---

[10] Whether extrinsic evidence of the impeachment, *i.e.* whether La. would have actually testified to the purported conversation, is separate from the ability to ask the question in the first place. Obviously, A.R. could have simply answered "yes" to the question, thereby proving the bias. ***Woeber*** remanded to determine if A.R. would have agreed that she told La. two other boys raped her, or if La. would have testified to the same.

[11] We recognize that Appellant himself would be a viable source of this type of testimony, but he elected not to testify. His claim sounds in confrontation and he did not claim any deprivation of his own right to testify.

THE COURT: The district attorney is shaking her head. I'll let you respond in a minute, Ms. Calisti.

. . . .

MS. CALISTI: Your Honor, **the Commonwealth did not discover this until after he was incarcerated.** Actually, I think it was very close to going to trial that he was going to testify for her.

N.T., 8/1-3/16, at 33-35 (emphasis added).

That the prosecutor contested the facts of the proffer is not an adequate basis to foreclose this line of inquiry. There is no reason to think that the prosecutor, as an officer of the court, was not telling the truth about what the Commonwealth knew. However, the fact that the Commonwealth was unaware of Appellant's role in Kilgore's trial does not necessarily mean that the same knowledge applied to M.K. Kilgore's case was listed for trial for over two years, and it is not implausible that Appellant's participation in Kilgore's case became known at some time before the instant accusations.

This case illustrates the difficulties occasioned by balancing a defendant's right to confront his accuser with the need to ensure that the fact-finding process is not undermined by sheer conjecture. Affirming judgment of sentence is unwarranted given the constitutional principles at issue. But so, too, is granting a new trial without any indication that the purported impeachment has some basis in reality. We therefore remand for an *in camera* evidentiary hearing in accordance with **_Woeber_**, **_supra_** .

Judgment of sentence vacated.  Case remanded for further proceedings in accordance with this memorandum.  Jurisdiction relinquished.

Judge Stabile joins the memorandum.

Judge Strassburger concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/28/2018