Joseph Robert FOLGER, A Minor, by His P/N/G, Robert J. FOLGER and Mary T. Folger, and Robert J. Folger and Mary T. Folger, in Their Own Right, Appellants

v.

Theresa DUGAN, M.D., Frankford Hospital, Sondra Dantzic, M.D., the Medical College of Pennsylvania, Eugene Andruczyk, D.O., Marilyn Wettlaufer, M.D., Wettlaufer, Andruczyk and Dugan, Appellees

Superior Court of Pennsylvania.

Argued Nov. 9, 2004.

Filed June 9, 2005.

■■■■■■■■■
■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■

———

David A. Yanoff, Philadelphia, for appellant.

Robert Toland II, Wayne, for Dantzic.

Alan S. Gold, Elkins Park, for Frankford Hospital.

Peter J. Hoffman, Philadelphia, for Dugan.

Before: DEL SOLE, P.J., HUDOCK, FORD ELLIOTT, JOYCE, STEVENS, LALLY–GREEN, TODD, KLEIN, and BOWES, JJ.

OPINION BY LALLY–GREEN, J.:

¶ 1 Appellants, Joseph Robert Folger, Robert J. Folger and Mary T. Folger, appeal from the trial court's November 15, 2002 order denying their post-trial motions.[1] We affirm.

¶ 2 The trial court summarized the facts and procedural history as follows:

This is a medical malpractice action brought by Plaintiff-minor Joseph Folger and his parents Robert and Mary Folger (hereinafter "Plaintiffs") against Theresa Dugan, M.D., Eugene Andruczyk, D.O., Marilyn Wettlaufer, M.D., Sondra Dantzic, M.D. and Frankford Hospital (hereinafter "Defendants"). On July 13, 1994, Plaintiff-minor was born at Defendant Frankford Hospital. Dr. Dugan was the obgyn attending at the birth and performed post-natal examinations. The testimony revealed that the infant had no significant problems at birth, had normal APGAR scores, had normal blood gasses and feedings were normal. Mother and baby were thereafter discharged on July 14, 1994.

Six days later, Plaintiff-minor developed a fever and was admitted to St. Christopher's Hospital for Children. While there, he was diagnosed with herpes encephalitis. The diagnosis was made in part on the basis of the results of a polymerase chain reaction test ("PCR test") performed on Plaintiff-minor's spinal fluid at the University of Alabama. The diagnosis was recorded into his medical chart and taken into consideration by his doctors, who determined the cause of his illness and recommended treatment accordingly.

Plaintiff sought to prove that the cause of Joseph's infirmities was negligence during the delivery which resulted in neurological defects. Plaintiff produced testimony that Plaintiff-minor was born as a face presentation, as opposed to a normal vertex presentation, causing traumatic birth injuries. Defendants countered that Plaintiff-minor was born as a normal vertex presentation and that his present condition is not a result of any negligence on the part of the Defendants. It is uncontested that Plaintiff-minor now suffers severe and permanent neurological injuries.

Trial commenced on June 7, 2002 and the jury returned a verdict in favor of [Defendants] on June 21, 2002.

Trial Court Opinion, 4/8/03, at 1–2.

¶ 3 Appellants filed post-trial motions, which the trial court denied. This appeal followed.

---

1. We note that the appeal properly lies from the judgment entered after the trial court's denial of Appellants' post-trial motions. Judgment was entered on December 9, 2002, the same day the instant appeal was filed. We will treat this appeal as an appeal from the final judgment. *See, Johnston The Florist, Inc. v. TEDCO Constr. Corp.,* 441 Pa.Super. 281, 657 A.2d 511, 514–515 (1995).

¶ 4 Appellants raise the following issues for our review:

(1) Whether, when the evidence clearly compelled a finding that Dr. Dugan was negligent, and the defense verdict can only have resulted from the manifestly unreasonable determination that Joseph Folger's mother knowingly imperiled her baby's life by lying to the doctors who were trying to diagnose and save him, and/or from improper consideration of evidence as to the etiology of Joseph's injuries which was patently inadmissible, that verdict shocks the conscience, making a new trial necessary.

(2) Whether it was reversible error to admit the "evidence" upon which defendants' entire exculpatory theory rested, the alleged result of alleged polymerase chain reaction ("PCR") testing, which was facially incompetent, unauthenticated, could not be challenged by cross-examination, and constituted inadmissible hearsay.

(3) Whether the admission of this evidence also was reversible error, as it should have been precluded (or at least subjected to prior scrutiny by the trial court, in its role as gatekeeper) under *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) and its Pennsylvania progeny.

(4) Whether it was reversible error to permit the defense to improperly use and introduce, as expert testimony, the discovery depositions of plaintiff's treating physicians, and the inadmissible opinions regarding the alleged PCR test result contained therein.

Appellants' Substituted Brief on Reargument at 2.[2]

¶ 5 Appellants first argue that a new trial is necessary because the jury returned a verdict that is contrary to the weight of the evidence.

The general rule for a grant of a new trial on the basis that it is against the weight of the evidence allows the granting of a new trial only when the jury's verdict is contrary to the evidence as to shock one's sense of justice and a new trial is necessary to rectify this situation. Unlike appellate review of a refusal to enter a judgment N.O.V., where the evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict winner, the appellate court, in reviewing the refusal to grant a new trial, ordinarily considers all of the evidence. The court is not required to consider the evidence in the light most favorable to the verdict winner when passing on the question of whether a verdict is against the weight of the evidence. Rather, the court is to view all of the evidence.

Moreover, a new trial will not be granted on the ground that the verdict was against the weight of the evidence where the evidence is conflicting and the fact-finder could have decided in favor of either party.

*Lanning v. West,* 803 A.2d 753, 765 –766 (Pa.Super.2002).

¶ 6 Appellants' argument is based largely on the testimony of Appellant Mary Folger. Mrs. Folger testified that, during the delivery of Joseph at Frankford Hospital, Appellee Theresa Dugan, M.D., manually rotated Joseph from a face presentation, which is abnormal, to a vertex presentation, which is normal. N.T., 6/13/02 p.m., at 45. Mrs. Folger claims that Dr. Dugan explained to her that she

---

**2.** Appellants preserved these issues in a timely filed Concise Statement of Matters Complained of on Appeal. Pa.R.A.P.1925(b).

manually rotated Joseph during delivery. *Id.* Dr. Dugan denies having manually rotated Joseph from a face to a vertex presentation or having told Mrs. Folger that she had done so. N.T., 6/17/02, at 118–119. Dr. Dugan testified that she is not familiar with any such procedure and does not believe it is possible. *Id.*

¶ 7 The record also reflects that when Mrs. Folger brought Joseph to St. Christopher's hospital on account of his fever, she told the treating physicians that the baby had been manually rotated during delivery. N.T., 6/13/02, p.m., at 55–56. Appellants claim that Mrs. Folger, as a nurse herself, was aware that the information she provided to the treating physicians was critical to proper diagnosis and treatment of Joseph's condition. Appellants argue that the jury's failure to credit Mrs. Folger's testimony shocks the conscience, since no mother would lie in circumstances where her child's health depends upon accurate information.

¶ 8 Appellees point out that the hospital's records indicate that Joseph's birth was a normal vertex presentation. Thus, these records support Dr. Dugan's testimony. Appellees argue that Mrs. Folger's testimony is based on a simple misunderstanding of what Mrs. Folger was told regarding Joseph's delivery.

¶ 9 The trial court found that the record contains conflicting evidence as to whether Joseph's injuries were the result of negligence. Trial Court Opinion, 4/8/03, at 4. Our own review of the record confirms the trial court's finding, as there is evidence in the record that conflicts with Mrs. Folger's version of events. Appellees produced a substantial amount of evidence indicating that Joseph's delivery was a normal vertex presentation and that there were no major problems with the delivery. N.T., 6/13/02, p.m., at 80; N.T., 6/17/02, at 88–89, 110–111, 118–119; N.T., 6/18/02, at 84; N.T.,

6/20/02, at 19–33. Accordingly, the jury was free to credit Appellees' version of events and to conclude that Mrs. Folger was mistaken. *Lanning.* The record reflects that the jury's verdict was not so contrary to the weight of the evidence as to shock one's sense of justice. Thus, the trial court did not abuse its discretion in denying a new trial on that basis. Appellants' first argument fails.

■■■■ ¶ 10 Appellants next argue that a new trial is necessary because the trial court erred in admitting PCR test results as evidence.

> This Court will not reverse a trial court's decision regarding the grant or refusal of a new trial absent an abuse of discretion or error of law.... Further, if the basis of the request is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful to the complaining party. Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment.

*Antoniotti v. Eckels,* 840 A.2d 1013, 1015–1016 (Pa.Super.2003). In making this determination, we must consider whether a new trial would produce a different verdict. *Gunn v. Grossman,* 748 A.2d 1235, 1239 (Pa.Super.2000). If there is any support in the record for the trial court's denial of a new trial, we must affirm the trial court's order. *Id.*

¶ 11 Appellants contend that the hospital records containing the PCR test results should not have been admitted for two reasons. Appellants claim the PCR test results were not properly authenticated under Pa.R.E. 901. Appellants also argue that the PCR test results were a matter of opinion rather than fact, and that the records were unreliable. Appellants con-

clude, therefore, that the PCR test results were not admissible under Pa.R.E. 803(6).

¶ 12 We first address Appellants' argument that Appellees failed to authenticate the St. Christopher's hospital records under Rule 901. Rule 901 provides as follows:

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Pa.R.E. 901. Rule 901(b)(1) further provides that evidence may be authenticated by the testimony of a witness. Moreover, Rule 803(6) provides that a records custodian or other qualified witness may authenticate business records.

¶ 13 We also note that issues not raised in the trial court are waived and cannot be raised for the first time on appeal. Pa. R.A.P. 302. Appellants' brief fails to direct us to a part of the record in which they raised the issue of authenticity. *See,* Appellants' Brief at 23–25. Our own review of the record does not reveal any point at which Appellants raised an issue under Rule 901. Rather, Appellants challenged the reliability of the PCR test results as reflected in the records of St. Christopher Hospital and the admissibility of the PCR test results under the hearsay rules. *Id.* Since Appellants did not object to the admissibility of the records under Rule 901 at trial, they have waived that argument for purposes of appeal.

¶ 14 We now turn our attention to Rule 803(6) and our jurisprudence governing the admissibility of medical records. Rule 803(6) defines records of regularly conducted activity as follows:

A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Pa.R.E. 803(6).

¶ 15 Medical records are admissible under the hearsay rules as evidence of facts contained therein but not as evidence of medical opinion or diagnosis. *Commonwealth v. Green,* 251 Pa.Super. 318, 380 A.2d 798, 799–801 (1977).

Medical diagnosis or opinion entails a "conclusion concerning a condition not visible but reflected circumstantially by the existence of other visible and known symptoms." The existence of a readily observable physical condition, the evaluation of which does not require a complex application of technical knowledge, can as easily be ascertained by the lay person as by the trained physician.

*Id.* at 801 (citations omitted).

¶ 16 The line between fact and opinion has been difficult to discern. In *Commonwealth v. Xiong,* 428 Pa.Super. 136, 630 A.2d 446 (1993) (*en banc*), the medical record at issue indicated that a rape victim had no hymen. We held that the statement was a fact, reasoning as follows: "[T]he notation clearly was not a

conclusory statement based on a review of symptoms. It was a physical fact. . . . It was not an opinion based statement, but rather based on an observation made during the exam." *Id.* at 452. Thus, the notation was an admissible business record.[3] Further, a party may introduce medical records as evidence of facts contained therein without producing the person who made the notation in the record or the records custodian. *In re Indyk,* 488 Pa. 567, 413 A.2d 371, 374 (1979). Anyone with sufficient knowledge of the identity, preparation and maintenance of the record may authenticate them. *Id.* at 373.

■■■■ ¶ 17 In general, when the record reveals what is or is not present in the patient, or that a test occurred, the record reflects facts. On the other hand, when the record reflects what the presence or absence of something means, the record more likely reflects a medical diagnosis or opinion.[4]

¶ 18 The record reflects that St. Christopher's Hospital sent samples of Joseph's spinal fluid to the University of Alabama for PCR testing, and that Joseph's spinal fluid was tested two times with positive results. N.T., 6/13/02 a.m., at 27; N.T., 6/19/02, at 44–46. The positive result indicated the presence of herpes in the spinal fluid.

¶ 19 Appellees argue that the presence of the herpes virus in spinal fluid is a matter of fact rather than of opinion. Thus, Appellees argue that the instant case is analogous to *Commonwealth v. Campbell,* 244 Pa.Super. 505, 368 A.2d 1299 (1976) (presence of spermatozoa in vagina is a matter of fact), and *Commonwealth v. Seville,* 266 Pa.Super. 587, 405 A.2d 1262 (1979) (presence of alcohol in blood stream is a matter of fact). Appel-

---

3. *Xiong* was decided under the Uniform Business Records as Evidence exception to the hearsay rule. 42 Pa.C.S.A. § 6108. Rule 803(6) differs "only slightly" from § 6108. Rule 803(6), comment.

4. The *Xiong* Court summarized numerous cases addressing the line between fact and opinion:

Drawing the line between what is fact and what is opinion is often difficult and has led to varying results. *See Williams v. McClain,* 513 Pa. 300, 520 A.2d 1374 (1987) (hospital record that contained impressions of social worker that plaintiff's pain may have a psychosomatic source was found to be inadmissible); *Commonwealth v. DiGiacomo,* 463 Pa. 449, 345 A.2d 605 (1975) (medical records custodian's testimony regarding diagnosis, as it was contained in hospital record, of injuries sustained by murder victim was inadmissible); *Commonwealth v. McCloud,* 457 Pa. 310, 322 A.2d 653 (1974) (autopsy report offered to prove essential element of crime or to connect appellant to crime where appellant was denied opportunity to cross-examine physician who prepared report, was inadmissible); *Commonwealth v. Hemingway,*

369 Pa.Super. 112, 534 A.2d 1104 (1987) (results of "rape kit", excluding the finding of spermatozoa, were held to be wrongly admitted into evidence without testimony of criminalist who conducted tests); *Commonwealth v. Campbell,* 244 Pa.Super. 505, 368 A.2d 1299 (1976) (hospital record stating that spermatozoa was found in victim's vagina was treated as fact and therefore was admissible); *Commonwealth v. Seville,* 266 Pa.Super. 587, 405 A.2d 1262 (1979), (medical report containing results of blood alcohol test was properly admitted into evidence even though technician who administered the test did not testify at trial); *Commonwealth v. McNaughton,* 252 Pa.Super. 302, 381 A.2d 929 (1977); (hospital record was inadmissible where it was the sole evidence offered by the Commonwealth to prove an essential element of the offense charged); *Commonwealth v. Green,* 251 Pa.Super. 318, 380 A.2d 798 (1977) (medical report stating that rape victim exhibited "excoriations" to elbow and forehead did not involve a medical diagnosis or opinion and therefore was admissible under Uniform Business Records as Evidence Act).

630 A.2d, at 452.

lants disagree, arguing that PCR test results are not sufficiently reliable to be taken as fact.

¶ 20 Here, the PCR test results reflect whether the herpes virus is or is not present in the patient's spinal fluid. The record reflects:

> When we take the spinal fluid, they look for those little snippets of virus. You couldn't make a whole virus grow because it's already broken apart. It's the debris of the virus. And what the PCR does, it says, let me see if there are any snippets that have this same sequence, the same signature of the whole virus.

N.T., 6/19/02, at 163. Therefore, while the PCR testing is a highly sophisticated process that must be conducted by a professional, the test results reveal what is or is not present in the patient. Thus, the test results are factual statements as to what exists in the spinal fluid. Since the presence (or lack thereof) of herpes DNA ·in spinal fluid is a fact, the medical record containing this fact is admissible as evidence of that fact. *Green; Xiong; Gunn.*

¶ 21 We next address whether St. Christopher Hospital's records of the PCR test results lacked trustworthiness. Rule 803(6) provides that business records are admissible unless "the sources of information or other circumstances indicate lack of trustworthiness." Pa.R.E. 803(6). Appellants bear the burden of demonstrating lack of trustworthiness. Pa.R.E. 803(6), comment. The trustworthiness of a business record is a function of whether there was motive or opportunity to falsify the record. *Commonwealth v. Zimmerman*, 391 Pa.Super. 569, 571 A.2d 1062, 1069 (1990). A record may be considered untrustworthy where the source of information cannot be established. *Isaacson v. Mobil Propane Corp.*, 315 Pa.Super. 42, 461 A.2d 625 (1983).

¶ 22 Appellants argue at length that the notations in the hospital's records are unreliable because they amount to nothing more than a notation that a resident medical student made after allegedly taking a telephone call from the University of Alabama laboratory. Appellants further argue that PCR testing was not reliable in 1994, when the tests of Joseph's spinal fluid allegedly took place.

¶ 23 The record reflects the following. An affidavit from the University of Alabama reflects that that institution does not have a record of having conducted PCR tests on Joseph's spinal fluid. N.T., 6/10/02, at 10–11. Appellees introduced evidence that university research laboratories do not always generate laboratory slips and that they commonly deliver test results by telephone. N.T., 6/19/02, at 168–169. Thus, the absence of any record at the University of Alabama did not go entirely unexplained.

¶ 24 Furthermore, the record reflects that, as of 1994, PCR testing was the preferred method for testing spinal fluid for the presence of herpes DNA. N.T., 6/13/02 a.m., at 30–31. The record reflects that false positives from PCR tests were highly unlikely, particularly in the case of a newborn infant. N.T., 6/19/02, at 57–61; N.T., 6/20/02, at 178–179.

¶ 25 There is no suggestion in the record that the staff at St. Christopher's Hospital had the motive or opportunity to falsify the PCR test results. Indeed, the alleged negligence with regard to Joseph Folger's delivery took place at Frankford Hospital. Also, Appellees introduced evidence establishing the source of the PCR test results.

¶ 26 Since Appellants fail to demonstrate a lack of trustworthiness with St. Christopher Hospital's record of the PCR test results, Appellants fail to demonstrate trial court error or abuse of discretion in the admission of the PCR test results. Appel-

lants fail to demonstrate that a new trial is necessary. *Antoniotti; Gunn.* Thus, Appellants' second argument fails.

¶ 27 Appellants next argue that the trial judge should have held a hearing pursuant to *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), as adopted in *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977). Appellants argue that several testifying experts improperly relied upon the PCR test results, which are inadmissible novel scientific evidence.

¶ 28 The law set forth in *Frye* and its progeny governs the admission of novel scientific evidence in Pennsylvania. The *Frye* Court wrote as follows:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Frye,* 293 F. at 1014.

¶ 29 *Frye* does not apply every time science enters the courtroom. *Trach v. Fellin,* 817 A.2d 1102, 1109 (Pa.Super.2003) (*en banc*). *Frye* does apply, however, where an expert witness employs a novel scientific methodology in reaching his or her conclusion. *Id.* at 1110. *See also, Grady v. Frito Lay,* 576 Pa. 546, 839 A.2d 1038 (2003).

¶ 30 The trial court addressed this issue as follows:

> In the instant case, the methodology of an expert testifying to a patient's medical record, which information was used by the patient's doctors to treat the patient was not subject to challenge. These are methods used by medical professionals every day and are not a proper subject for a *Frye* analysis.

Trial Court Opinion, 4/8/03, at 8.

¶ 31 We agree. In the instant matter, Appellants neither challenge the methodology employed by any expert witness nor the general existence of PCR testing in the medical field. Appellants challenge the accuracy of the PCR test results. Appellants did not argue that PCR methodology was novel or junk science as of the time the tests in question were conducted. Thus, while science entered the trial court's courtroom, *Frye* did not. The trial court did not err in declining to conduct a *Frye* hearing.

¶ 32 The related issue here is the use of the PCR test results by the testifying expert witnesses. The facts underlying an expert opinion must be of record so that the jury can evaluate the veracity of the facts. *Commonwealth v. Rounds,* 518 Pa. 204, 542 A.2d 997 (1988). The *Rounds* Court addressed the importance of the facts underlying an opinion as follows:

> [E]xpert opinion testimony is proper if the facts upon which it is based are of record. This requirement for admissibility of opinion testimony is crucial. The purpose of expert testimony is to assist the factfinder in understanding issues which are complex or go beyond common knowledge. An expert's function is to assist the jury in understanding the problem so that the jury can make the ultimate determination. If a jury disbelieves the facts upon which the opinion is based, the jury undoubtedly will disregard the expert's opinion. Likewise, if a jury accepts the veracity of the facts which the expert relies upon, it is more likely that the jury will accept

the expert's opinion. At the heart of any analysis is the veracity of the facts upon which the conclusion is based.

*Id.* at 999 (emphasis added).

¶ 33 Appellants challenge the veracity of the PCR test results. The trial court found that Appellees adequately established the veracity of the PCR test results. Trial Court Opinion, 4/8/03, at 8.

¶ 34 Again, we agree with the trial court. The record establishes that the PCR testing was reliable and that such testing is relied upon in the field for the diagnosis of herpes encephalitis. N.T., 6/13/02 a.m., at 30–31; N.T., 6/19/02, at 60–61, 163–165. Moreover, the record indicates that, as of 1994, the University of Alabama was widely respected for its PCR testing and that the doctor who ran the Alabama laboratory was highly regarded for his herpes research. N.T., 6/19/02, at 163–165. The University of Alabama laboratory had the personnel and the technology to produce accurate PCR test results. *Id.* The PCR testing at the University of Alabama was state of the art as of that time. *Id.* Thus, there is evidence in the record indicating that the PCR test results were trustworthy. Thus, the jury could have believed the veracity of the PCR test results and the expert opinion testimony based on those results. *Rounds.* Since Appellants fail to demonstrate that the trial court erred or abused its discretion in admitting the PCR test results, Appellants' third argument fails.

¶ 35 Finally, Appellants argue that the trial court erred in admitting deposition testimony of expert opinions based in part on the PCR test results. Inasmuch as we have already concluded that evidence of the PCR test results was properly admitted, Appellants' final argument fails.[5]

¶ 36 Order affirmed.

¶ 37 JOYCE, J. files a Dissenting Opinion, in which TODD, J. joins.

JOYCE, J., Dissenting:

¶ 1 I believe that evidence concerning PCR test results constituted double hearsay and that admission of the evidence constituted reversible error. Accordingly, I respectfully dissent.

¶ 2 The Majority correctly notes that, "[m]edical records are admissible under the hearsay rules as evidence of facts contained therein but not as evidence of medical opinion or diagnosis." Majority Opinion at 1055 (citing *Commonwealth v. Green*, 251 Pa.Super. 318, 380 A.2d 798, 800–01 (1977)). Acknowledging the blurred line that sometimes exists between fact and opinion, the Majority concludes:

> In general, when the record reveals what is or is not present in the patient, or that a test occurred, the record reflects facts. On the other hand, when the record reflects what the presence or absence of something means, the record more likely reflects a medical diagnosis or opinion.

*Id.* at 1056 (citing *Commonwealth v. Xiong*, 428 Pa.Super. 136, 630 A.2d 446 (1993) (*en banc*)).

¶ 3 After determining that the medical records in the present case reflected that a test occurred, and that the PCR test results reflected that the herpes virus was present in Joseph Folger's spinal fluid, the Majority stated that "the medical record

---

5. We note also that Pa.R.E. 705 permits experts to testify as to inadmissible facts, so long as those facts are of a type reasonably relied upon by experts in the field. Both parties devoted portions of their argument to the applicability of Rule 705. Since we have concluded that the hospital's records of the PCR tests are admissible as business records, we need not address the applicability of Rule 705.

containing this fact is admissible as evidence of that fact." *Id.* at 1057 (citing *Green, supra; Xiong, supra;* and *Gunn v. Grossman,* 748 A.2d 1235 (Pa.Super.2000)).

¶ 4 While I can envision circumstances that would support the Majority's conclusion, those circumstances do not exist in the record in this case. What we have here is a notation in a medical record memorializing a physician's order for a PCR test; a note indicating that a PCR test was reported to be positive; and a subsequent notation suggesting that a second PCR test was positive as well. Unfortunately, we know nothing more about any PCR test or test results.

¶ 5 There is no packing slip reflecting that a sample of Joseph Folger's spinal fluid was transmitted to the University of Alabama research facility where PCR testing was conducted in 1994. There is no written verification of receipt of a sample by that facility. There is no research facility documentation to reflect that the test was actually conducted, either once or twice. There is no record of written results being transmitted from the University of Alabama to St. Christopher's Hospital. In fact, an affidavit from the University of Alabama reflects that a search was conducted of its records dating back to 1994. That search, according to the affidavit, uncovered no evidence whatsoever of any herpes PCR test being conducted on a specimen received for Joseph Folger.

¶ 6 Testimony was offered to suggest that a St. Christopher's medical student recorded the first positive result based on information conveyed in a telephone conversation with someone from the University of Alabama. If that note reflected the medical student's own observations of the test results, but that student was not available to testify, testimony relative to the student's notation would constitute hearsay, as an out-of-court statement offered to prove the truth of the matter asserted in the record, *i.e.,* a positive PCR result. Yet, under *Xiong, supra,* the notation would reflect the fact that the test occurred and would be admissible. But the test result recorded in Joseph Folger's medical record was not a result observed by the medical student. Instead, it was a recording by a medical student—who was unavailable for cross-examination—supposedly based on information provided by some unknown person at the University of Alabama—who was also unavailable for cross-examination. As such, the note in the medical record was an out-of-court declaration based on a second out-of-court declaration. As our Supreme Court has stated, "An out-of-court declaration containing another out-of-court declaration is double hearsay." *Commonwealth v. Laich,* 566 Pa. 19, 25, 777 A.2d 1057, 1060 (2001).

¶ 7 The PCR test result in Joseph Folger's medical records is clearly double hearsay. The question then becomes whether that double hearsay is admissible.

¶ 8 "In order for double hearsay to be admissible, the reliability and trustworthiness of each declarant must be independently established. This requirement is satisfied when each statement comes within an exception to the hearsay rule." *Id.* (citations omitted).

¶ 9 In the *Laich* case, the Supreme Court considered whether testimony permitted at trial constituted double hearsay. The Court concluded that the first layer of hearsay fell within the "party admission" exception to the rule, but the second layer did not qualify under any exception to the rule. Likewise, in the present case, the second layer of hearsay, purportedly originating from someone at the University of Alabama research facility, does not fall within any recognized exception to the

hearsay rule. Because there is no applicable exception, and because neither the reliability nor the trustworthiness of the Alabama declarant's statement can be established, the trial court erred in allowing admission of double hearsay in this case.

¶ 10 An error in admitting the testimony is not, by itself, sufficient to warrant reversal of the trial court's denial of the Folgers' motion for new trial. As this Court has stated, "[i]n order to find that the trial court's evidentiary rulings constituted reversible error, such rulings must not only have been erroneous but must also have been harmful to the complaining party." *Collins v. Cooper,* 746 A.2d 615, 619 (Pa.Super.2000) (citations omitted). "Appellant must therefore show error in the evidentiary ruling and resulting prejudice, thus constituting an abuse of discretion by the lower court." *Id. See also Anderson v. Hughes,* 417 Pa. 87, 92, 208 A.2d 789, 791 (1965) (to constitute reversible error, a ruling on evidence must be shown not only to have been erroneous but harmful to the party complaining). "When improperly admitted testimony may have affected a verdict, the only correct remedy is the grant of a new trial." *Woodard v. Chatterjee,* 827 A.2d 433, 440–41 (Pa.Super.2003) (quoting *Oxford Presbyterian Church v. Weil–McLain Co., Inc.,* 815 A.2d 1094, 1099 (Pa.Super.2003)).

¶ 11 As a panel of this Court stated in the present case, in an opinion that was withdrawn after reargument was granted:

Our review of the record discloses that the pivotal question in this case was whether Joseph's injuries were caused by the negligence of Dr. Dugan during Joseph's delivery, or by herpes encephalitis. Accordingly, the PCR test results presented the jury with circumstantial evidence of a lack of negligence by Dr. Dugan. Because the PCR test results provided evidence of a lack of negligence by Dr. Dugan and the Defendants, we cannot conclude that the error in the admission of the results was harmless.

*Folger v. Dugan,* 2004 PA Super 6, ¶ 16 (Jan. 9, 2004).

¶ 12 Because I believe the trial court erred by permitting evidence of the PCR test results, and because I believe the admission of that evidence was harmful to the Folgers, I would reverse the trial court's denial of the Folgers' post-trial motions, and would grant a new trial excluding reference to the PCR test results.