J-S31039-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RAYMOND BRADLEY | : | |
| | : | |
| Appellant | : | No. 1763 EDA 2024 |

Appeal from the Judgment of Sentence Entered February 20, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004190-2021

BEFORE:  PANELLA, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                **FILED NOVEMBER 24, 2025**

Appellant Raymond Bradley appeals from the judgment of sentence imposed after a jury convicted him of first-degree murder, firearms not to be carried without a license, carrying a firearm in public in Philadelphia, and possessing an instrument of crime (PIC).[1]  On appeal, Appellant challenges the sufficiency of the evidence, the trial court's decision to allow jurors to take notes during the replay of the Commonwealth's compilation video, the empaneling of an alternate juror, and the authenticity of the compilation video.  After review, we affirm.

The trial court summarized the facts of this case as follows:

This case arises from a shooting incident on March 24, 2020, in the 6000 block of Reinhard Street, Philadelphia, Pa. that resulted in the death of Ahmier Torrence [(Victim)].

_____

[1] 18 Pa.C.S. §§ 2502(a), 6106(a)(1), 6108, and 907(a), respectively.

On March 24, 2020, Sergent Fei Deng (hereinafter "Sgt. Deng") responded with his partner Officer [Broc] Johnson to a radio call for a person shot at the location of 6012 Reinhard Street. There he observed a frantic group of people around a male who was unresponsive. Due to [] Victim's loss of blood, the officers "scooped" him into a patrol vehicle for immediate transport to the hospital. Afterwards Sgt. Deng secured the scene with police tape.

Police Officer Brian Solomon (hereinafter "Officer Solomon") received a 911 call at approximately 7:00 pm that a male was shot on 6012 Reinhard Street. He drove to the area with his partner Officer Pizzo and saw multiple police and vehicles on location. Once on scene, Sgt. Deng placed the shooting victim inside their police vehicle, and they transported him to the nearest trauma center at Presbyterian Hospital. [Victim] was pronounced deceased upon arrival. Officer Soloman obtained a fingerprint scanner and identified [Victim] through police records.

The parties stipulated that Dr. Khalil Wardak (hereinafter Dr. Wardak), the Assistant Medical Examiner for the City of Philadelphia was an expert in the field of forensic pathology. Dr. Wardak conducted the autopsy on [] Victim . . . and noted "a single bullet entrance [to the] right lower flank or lower back." [Dr. Wardak] further indicated, "the bullet passe[d] through the right kidney, the liver, . . . the right side of the diaphragm, passe[d] through the right side of the heart and passe[d] through the aorta valve, the largest vessel in the body, and exit[ed] from between [the] left collar bone and the first rib." His report reflected that [Victim's] blood analysis was positive for a trace of Oxycodone. However, Dr. Wardak determined [] Victim's cause of death was a gunshot wound to the torso and the manner of death was homicide.

Detective Craig Coulter (hereinafter "Detective Coulter") of the homicide unit investigated the scene of the crime and indicated no eyewitnesses could be located. However, he recovered recordings from five camera locations (Anna's Market, S&P Grocery Store, Great Wall Chinese Food Store, Upland Beer Deli, and City of Philadelphia Police Pole Camera), as detailed in the video recovery sheet with the assistance of other detectives. Homicide Detective Kert Wilson (hereinafter "Detective Wilson") specializes in the processing of video evidence. He also assisted in the recovery of video from four of the businesses, three of which were used in the compilation video (C-62) presented in court: "The Great Wall

- 2 -

Chinese Store" at the corner of 60th and Reinhard, the "Real Time Crime System" telephone pole cameras, and "The Upland Deli" located at the end of the block. Both Detectives clarified the location of each recorder, the camera angles, and time offsets. Detective Coulter participated in the video compilation process.

The compilation video (C-62) was played for the jury, first showing a red/burgundy Chrysler Sebring parking on Upland Street. Detective Wilson pointed out the male who exited the car was wearing a dark hooded sweatshirt with white strings and a logo that "look[ed] like the word 'Champion' across the chest." The next surveillance footage depicted the interior of Anna's Market where the same male is seen standing at the counter purchasing a drink. Detective Coulter obtained the store's transaction records from the date and time of purchase showing a duplicate credit card receipt with Appellant's name, "Bradley, R." (C-34) at 6:26 pm. The same individual is subsequently viewed on a different camera angle a few blocks nearby riding a bicycle on the sidewalk in the like attire, conversing with [] Victim. . . . Shortly thereafter another video depicts him dropping the bag holding the drink to the ground and abandoning the bike. The next camera shows the male with [a] firearm shooting in the area where [] Victim [was] killed. A different video angle portrays the same male running away from the scene, through the breezeway between two houses. The final footage shows him running back to the Chrysler, attempting unsuccessfully to open the car door and running away again.

Police Officer Dennis Moore (hereinafter "Officer Moore") of the crime scene unit prepared the CSU report in addition to a sketch of the location. He took photographs of a red blood stain under a fence area, strike marks, keys, and the location of eleven (11) fired cartridge casings (FCCs). Officer Moore also recovered this evidence including the FCCs, the set of keys and samples of the blood for testing. The eleven FCCs were imprinted with the manufacturer stamp "Aguila - .40 caliber Smith & Wesson." The keys recovered at the crime scene opened the Chrysler Sebring parked on Upland Street, that was depicted in the compilation video.

Police Officer Christine Hilbert (hereinafter "Officer Hilbert"), also of the crime scene unit processed the 2002 Chrysler Sebring at the request of homicide. The automobile was initially photographed, then its exterior and interior were processed for fingerprints and DNA. A subsequent internal search of the car

recovered a magazine loaded with fourteen (14) live cartridges that were also stamped "Aguila - .40 caliber Smith & Wesson." Officer Hilbert swabbed the magazine for DNA. Found in the center console of the vehicle was Appellant's driver's license. The car was registered to an individual named "Nicole Petit."

[P]rior to the shooting incident, on February 4, 2020, Police Officer Phillip Dearborn (hereinafter "Officer Dearborn") conducted a car stop of a burgundy Chrysler Sebring at the location of 6100 Kingsessing Avenue in Philadelphia, PA, at 8:34 pm. Appellant was the driver of the car on that date and time as verified by his driver's license. Officer Dearborn presented police paperwork confirming it was the same vehicle depicted in the compilation video, verifying the make, model, and VIN number of the automobile. This information was identical to the information obtained by the crime scene unit on the date of the shooting.

The parties stipulated that Police Officer Raymond Andrejczak (hereinafter "Officer Andrejczak") was an expert in firearms identification which included anything firearms-related (gun accessories, magazines, projectiles, bullets and FCCs). He prepared a report on the evidence provided from the medical examiner's office, collected from the crime scene, and the vehicle. Officer Andrejczak determined the eleven FCCs were all fired from the same gun based on the bullet markings and then demonstrated the process of the bullet expelling from a weapon. He agreed with other officers that the FCCs and the fourteen live cartridges in the magazines were "Aguila - .40 caliber Smith & Wesson" brand ammunition. Officer Andrejczak conceded no firearm was recovered in the investigation but agreed the magazine "would fit in a .40 caliber pistol."

The parties also stipulated that Forensic Scientist Lisette Vega (hereinafter "Ms. Vega") is an expert in the field of DNA analysis. Ms. Vega explained the composition of DNA and the process of DNA analysis. A DNA swab was taken from both [Victim] and [] Appellant. Testing of the car's exterior driver side rear door, the interior driver side front handle/control, and steering wheel revealed Appellant was "included as a source of the major component of the DNA mixture detected in the sample." DNA testing of the other areas of the vehicle and the keys found at the scene was determined to be inconclusive DNA evidence pertaining to Appellant. Ms. Vega testified there was evidence of least four individuals found in the DNA mixtures. A swab was provided for

the magazine and cartridges, but the sample did not contain any DNA evidence to be tested.

\* \* \*

On September 18, 2022, Police Officer Mathew Stasik (hereinafter "Officer Stasik") was in plainclothes in an unmarked vehicle with his partner when he saw a black Ford Fusion on the corner of Carlisle and Clearfield Avenue. The officer immediately recognized Appellant and knew he was wanted for a homicide. When his partner exited the police car, Appellant fled west into a rear alley. The officers gave chase until they lost sight of him and secured the area, then contacted K-9 and SWAT units for backup. Officer Stasik later observed Appellant on the roof of a row home.

Police Officer John Snyder (hereinafter "Officer Snyder") of the K-9 unit responded to the Clearfield location with his partner, a German Shepard named Joe-Joe (hereinafter "Joe"). Joe is a patrol and scent dog trained in location of narcotics, explosives, cadavers and criminal apprehension. Based on the scent of Appellant's last confirmed location, the German Shepard Joe ascertained the row home in which Appellant was located. Officer Snyder then directed the squad to set up a perimeter around the area and Appellant was seen on the roof.

Police Officer Phillip Scratchard (hereinafter "Officer Scratchard") of the SWAT Unit, received a call for a barricaded person at 1418 West Clearfield Street. Upon arrival he saw Appellant running along the rooftops of five or six properties on that block. The Officer's SWAT team was in a BearCat armored vehicle awaiting fire and rescue for a secure ladder to climb up the building. Officer Scratchard apprehended Appellant on a roof with three partners. The incident was captured on video (C-61).

The parties stipulated that Appellant did not have a valid license to carry a firearm (C-35).

Trial Ct. Op., 9/19/24, at 3-8 (some citations omitted and some formatting altered).

Appellant was arrested and charged with first-degree murder, possession of firearm prohibited, firearms not to be carried without a license,

carrying a firearm in public in Philadelphia, and PIC. On February 20, 2024, Appellant was convicted of first-degree murder, firearms not to be carried without a license, carrying a firearm in public in Philadelphia,[2] and PIC after a jury trial.[3] The trial court sentenced Appellant to life incarceration without the possibility of parole for first-degree murder[4] and imposed no further penalty on the remaining charges.

Appellant filed a post-sentence motion on February 22, 2024. That same day, trial counsel moved to withdraw. On March 5, 2024, the trial court granted trial counsel's motion to withdraw and appointed Joseph Schultz, Esq. to represent Appellant on direct appeal. On June 25, 2024, Appellant's post-sentence motion was denied by operation of law.[5]

Appellant filed a timely notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

---

[2] Recently, a panel of this Court concluded that Section 6108 was unconstitutional as applied to the appellant in that matter. **See Commonwealth v. Sumpter**, 340 A.3d 977, 988 (Pa. Super. 2025). As a new rule of law, the **Sumpter** decision applies retroactively to cases pending on direct appeal so long as the issue was preserved at all stages of adjudication. **See Commonwealth v. Grooms**, 247 A.3d 31, 37 n.8 (Pa. Super. 2021). Here, Appellant did not challenge the constitutionality of Section 6108. Therefore, Appellant has not preserved this issue, and we are constrained to find it waived on appeal. **See id.**

[3] The single count of possession of firearm prohibited was *nolle prossed* at the conclusion of the trial. **See** N.T., 2/20/24, at 18.

[4] **See** 18 Pa.C.S. § 1102(a).

[5] **See** Pa.R.Crim.P. 720(B)(3)(a).

Appellant raises the following issues for our review, which we have reordered as follows:

1. The evidence presented at trial was insufficient to establish beyond a reasonable doubt that [] Appellant shot and killed the victim?

2. Whether the trial court erred and abused its discretion by denying the defense's objection to the jury taking notes during a replay of the video that captured the shooting?

3. Whether the trial court erred and abused its discretion by improperly empaneling an alternative juror after deliberations had begun?

4. Whether the trial court erred and abused its discretion by denying the defense's objection to the compilation video from Upland Beer Distributor and S&P Grocery, which lacked the necessary surveillance recovery forms?

Appellant's Brief at vii (some formatting altered).

### Sufficiency Claim

In his first claim, Appellant challenges the sufficiency of the evidence for first-degree murder. *Id.* at 16-17. Specifically, Appellant contends that the evidence was insufficient to prove he was the shooter or that he had the specific intent to kill.[6] *See id.*

When reviewing a challenge to the sufficiency of the evidence, we are governed by the following standard:

_____

[6] Appellant also argues that the Commonwealth failed to establish a motive linking him to the crime. *See* Appellant's Brief at 16. However, "[i]t is well established that the Commonwealth is not required, as a matter of law, to prove the accused's motive even where the offense charged is murder in the first degree." *Commonwealth v. Briggs*, 12 A.3d 291, 340 n.44 (Pa. 2011). Accordingly, we do not further address this argument.

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

*Commonwealth v. Palmer*, 192 A.3d 85, 89 (Pa. Super. 2018) (citation omitted and formatting altered).

Our Supreme Court has explained:

There are three elements of first-degree murder: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. As set forth in the third element, first-degree murder is an intentional killing, *i.e.*, a willful, deliberate and premeditated killing. Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death. The law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second. Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. Whether the accused had formed the specific intent to kill is a question of fact to be determined by the jury.

*Commonwealth v. Jordan*, 65 A.3d 318, 323 (Pa. 2013) (citations omitted and some formatting altered).

- 8 -

"In addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes." **Commonwealth v. Smyser**, 195 A.3d 912, 915 (Pa. Super. 2018) (citation omitted). "Evidence of identi[ty] need not be positive and certain to sustain a conviction." **Id.** (citation omitted). "[A]ny indefiniteness and uncertainty in the identification testimony goes to its weight. Direct evidence of identity is, of course, not necessary and a defendant may be convicted solely on circumstantial evidence." **Id.** (citing **Commonwealth v. Hickman**, 309 A.2d 564, 566 (Pa. 1973)).

Here, the trial court addressed Appellant's sufficiency claim as follows:

The jury viewed the compilation video in court, accompanied by the testimony of two homicide detectives (Wilson and Coulter), that depicted an individual in a black hoodie sweatshirt purchasing a drink at Anna's Market. The same male is subsequently seen on camera a few blocks nearby placing the purchased drink on the ground then shooting a firearm in the same attire where the victim was killed. The jurors reviewed the credit card receipt (C34) from the store's transaction records matching the date and time of the purchase seen in the video. The card used reflected Appellant's name "Bradley, R."

\* \* \*

In the instant matter the jury heard testimony that the perpetrator used a deadly weapon (a firearm) in this incident and the CSU officer recovered eleven FCCs at the location of the shooting. The autopsy revealed the victim sustained a single bullet in his lower back that pierced his kidney, liver, and heart prior to exiting his body. The medical examiner confirmed the cause of death was the gunshot wound to the torso from the impact on these vital organs, ruling the manner of death a homicide. The use of a firearm (an inherently deadly weapon), in conjunction with the number of FCCs recovered on scene, the shooting of the victim in

- 9 -

the back torso area, and the video identification provided sufficient evidence for the jury to conclude Appellant acted with the specific intent to kill.

Trial Ct. Op. at 16-18 (citations omitted and some formatting changed).

Following our review of the record, we agree with the trial court that the evidence was sufficient to sustain the verdict for first-degree murder. As the trial court noted, the jury viewed a compilation video that depicted the events before, during, and after the shooting. The compilation showed the shooter arrive at the scene in a burgundy-colored Chrysler Sebring, at which time he exited the car and walked to a nearby house. *See* Commonwealth Exhibit C-62 (Compilation Video). The shooter's face was clearly visible in the compilation video, and he was depicted wearing a black hoodie with the word "Champion" on it. *Id.* Approximately thirty minutes later, the cameras showed the shooter entering a local store and purchasing a beverage with a credit or debit card. *Id.* Again, the shooter's face was clearly visible, and he was wearing the same hoodie. *Id.* The video also showed the shooter leaving the store with the beverage in a plastic bag. *Id.*

Approximately half an hour later, the cameras depicted the shooter on a bike wearing the same hoodie and holding the beverage, which was still in the plastic bag. *Id.* As Victim turned to walk down Reinhard St., the video showed the shooter drop the plastic bag at the corner of Reinhard and South 60th Streets and follow the Victim down Reinhard Street before the shooter got off the bike and left it up against a signpost. *Id.* The shooter then appeared to talk to Victim before he extended his arm out in a motion

consistent with firing a weapon. *Id.* The video showed that the shooter fled and eventually headed toward the location of the Chrysler Sebring. *Id.* Thereafter, the video depicted the shooter at the driver's side door of the car before showing him run from the block where the Sebring was parked. *Id.*

Further, the Commonwealth presented additional circumstantial evidence which showed that Appellant was the shooter in the video. Specifically, Officer Phillip Dearborn testified that a month before the shooting, he pulled Appellant over in the exact same Chrysler Sebring that the shooter used to arrive at the scene of the shooting. *See* N.T., 2/15/24, at 6-10, 36-38. Further, Appellant's driver's license was found in the Chrysler Sebring's center console after the shooting. *See* N.T., 2/14/24, at 71-72. The Commonwealth also admitted a credit card receipt showing that Appellant made a purchase in the store at the same time the shooter was seen making a credit card purchase in the video. *See* Commonwealth Exhibit C-34 (Receipt); *see also* N.T., 2/15/24, at 34-35; Commonwealth Exhibit C-62 (Compilation Video). Further, the Commonwealth presented video from the time of Appellant's arrest and testimony from police officers involved in the arrest, which established that Appellant ran from police, hid on a roof, and pushed a ladder off a roof to prevent his apprehension. *See* Commonwealth Exhibit C-61 (Arrest Date Video); *see also* N.T., 2/14/24, at 160-66; N.T., 2/15/24, at 50-58.

In sum, we agree with the trial court that the above evidence was sufficient to establish that Appellant was the shooter. First, the jury was able

to view the video, which clearly showed the shooter's face, and compare the person in the video to Appellant as he sat in the courtroom. ***See Commonwealth v. Childs***, 63 A.3d 323, 327 (Pa. Super. 2013) (rejecting a weight of the evidence claim concluding that the factfinder "was shown the surveillance video that served to identify [the defendant] and was able to draw its own conclusions" (some formatting altered)); ***see also Commonwealth v. Russell***, 800 WDA 2024, 2025 WL 1091553, at *10 (Pa. Super. filed Apr. 9, 2025) (unpublished mem.) (stating that, based upon viewing the video evidence and seeing the defendant in court, the jury was free to determine that defendant was the man depicted in the video).[7]

Additionally, the shooter's use of the Chrysler Sebring, the police testimony that Appellant had access to that same vehicle, and the presence of Appellant's driver's license in the vehicle after the shooting was strong circumstantial evidence that Appellant was the shooter. Further, the shooter's use of Appellant's credit card was additional compelling circumstantial evidence that Appellant was the shooter depicted in the video.[8] Finally,

_____

[7] ***See*** Pa.R.A.P. 126(b) (stating this Court may rely on unpublished decisions of this Court filed after May 1, 2019, for their persuasive value).

[8] Appellant challenges the credit card evidence by arguing that the Commonwealth "failed to prove that the Appellant was the one who actually used the card" and "that Credit and debit cards are often shared, borrowed, stolen, or even used without the owner's knowledge." Appellant's Brief at 17. However, when addressing the sufficiency of the evidence, "the entire record must be evaluated and all evidence received must be considered." ***See Commonwealth v. Williams***, 255 A.3d 565, 578 (Pa. Super. 2021). As
*(Footnote Continued Next Page)*

Appellant's actions to avoid apprehension demonstrated his consciousness of guilt. *See Commonwealth v. Pestinikas*, 617 A.2d 1339, 1347-48 (Pa. Super. 1992) (stating that "[i]t is well settled that when a person has committed a crime, and knows that he is wanted for it, any attempt by that person to flee or conceal his whereabouts, to escape from custody or resist arrest, . . . or to otherwise engage in conduct designed to avoid apprehension or prosecution for such crime may be admissible as evidence of consciousness of guilt, and may, along with other evidence in the case, form a basis from which guilt may be inferred" (citation omitted)).

As to specific intent to kill, as the trial court points out, Appellant fired eleven rounds at Victim, one of which struck Victim in his lower back which pierced his kidney, liver, and heart, which ultimately caused his death. *See* N.T., 2/13/24, at 78-80; N.T., 2/14/24, at 26-30, 87. Under those circumstances, the jury was free to infer specific intent to kill. *See Jordan*, 65 A.3d at 323 (stating specific intent to kill can be inferred from the use of a deadly weapon on a vital area of the body); *Commonwealth v. Tucker*, 143 A.3d 955, 964-65 (Pa. Super. 2016) (finding the jury could infer specific intent to kill where defendant fired three gunshots at the victim but only struck the

___

stated above, the totality of the evidence presented at trial established that Appellant was the shooter. To the extent that Appellant is arguing that the jury placed too much weight on the credit card evidence, that claim is waived. *See* Pa.R.Crim.P. 607(A) & cmt. (stating that to preserve a weight of the evidence for appellate review a claim must be raised before the trial court "orally, on the record, at any time before sentencing; by written motion at any time before sentencing; or in a post-sentence motion" (some formatting altered)).

victim once in the thigh); ***Commonwealth v. Tolbert-McGhee***, 1331 WDA 2020, 2021 WL 5819809, at *3 (Pa. Super. filed Dec. 7, 2021) (unpublished mem.) (explaining that "firing a dozen shots at a victim at close range is surely sufficient to prove, beyond a reasonable doubt, a specific intent to kill" (footnote omitted)); ***see also Commonwealth v. Dick***, 978 A.2d 956, 959 (Pa. 2009) (identifying the back as a vital area of the body); ***Briggs***, 12 A.3d at 307 (stating that a firearm is a deadly weapon and that "[t]he chest and abdomen house the human body's chief circulatory and digestive organs, as well as a network of vital arteries and veins which supply them and, thus, are vital areas of the body" (citation omitted)).

Therefore, we conclude that the evidence admitted at trial was sufficient to prove Appellant was the shooter and that he committed the shooting with the specific intent to kill. ***See Jordan***, 65 A.3d at 323; ***Palmer***, 192 A.3d 85, 89. Accordingly, no relief is due.

### Jury Note Taking Claim

Appellant next claims that the trial court erred by allowing the jury to take notes during the replay of the compilation video after the jury asked to see the video again during deliberations. Appellant's Brief at 12-15. Appellant claims that while Pa.R.Crim.P. 644 and 646 allow jurors to take notes in certain cases, the rules only allow jurors to "use" their notes during deliberations. ***See id.*** at 13. Appellant argues that a plain reading of Rule 644(a)(5) and its use of the phrases "access to their notes" and "use" of their

notes suggests that a jury's notes must be "pre-existing before deliberations." *Id.* Further, Appellant argues that the canons of textual interpretation, specifically the negative implication canon,[9] support that the statute does not allow note taking during deliberations or "post-trial evidentiary review" because the rule permits note taking explicitly during "opening statements, the presentation of evidence, and closing arguments" but is silent regarding deliberations and "post-trial evidentiary review." *Id.* at 13-14. Appellant claims that he was prejudiced by the jurors' note taking because it may have caused undue emphasis on the video and because, once an alternative juror was seated, "the new juror lacked notes as she was not present when the video was replayed the first time [and w]hen video of the shooting was played again with the new juror, the jury did not take notes[, which] allowed the other jurors to potentially overemphasize the evidence they recorded while watching the first video, creating an uneven deliberation since the new juror could not refute their recollections." *Id.* at 14.

Appellant's claim requires us to interpret Pa.R.Crim.P. 644, which raises a question of law. *See Commonwealth v. Kapellusch*, 323 A.3d 837, 845 (Pa. Super. 2024). This Court has previously stated that in interpreting a rule of criminal procedure,

_____

[9] The negative implication canon, often referred to by the Latin name *expressio unius est exclusio alterius*, states that "the inclusion of a specific matter in a statute implies the exclusion of other matters." *Commonwealth v. Henck*, 342 A.3d 726, 734 (Pa. Super. 2025).

- 15 -

our standard of review is *de novo* and the scope of review is plenary. The Rules of Criminal Procedure are to be construed in consonance with the rules of statutory construction. The object of all interpretation and construction of rules is to ascertain and effectuate the intention of the Pennsylvania Supreme Court. In construing the language, and giving it effect, we should not interpret a rule's words in isolation, but must read them with reference to the context in which they appear.

*Id.* at 845-46 (internal quotation marks and citations omitted and some formatting altered). Additionally, "[e]very rule shall be construed, if possible, to give effect to all its provisions. When the words of a rule are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Pa.R.J.A. 108(b).

Generally, jurors are permitted to take notes during trial pursuant to Pa.R.Crim.P. 644. *See* Pa.R.Crim.P. 644. Rule 644 allows the taking of notes "during opening statements, the presentation of evidence, and closing arguments for [the jurors'] use during deliberations." *Id.* at 644(A). However, note taking is not unlimited as Rule 644 does not allow note taking "during the judge's charge at the conclusion of the trial." Pa.R.Crim.P. 644(A)(1).

Further, Rule 644 provides additional procedural requirements for note taking. *See* Pa.R.Crim.P. 644. Specifically, the trial court is required to collect or maintain the notes at each break, recess, and at the end of each day of trial. *Id.* at (A)(5). Additionally, the notes are required to always remain in the court's custody. *Id.* at (A)(4). Importantly, jurors must provide their notes to the trial court before the verdict is announced and, when the jury is

- 16 -

discharged, the trial court must destroy the notes "without inspection." **Id.** at (A)(7). Moreover, the rule bars "[t]he court, the attorney for the Commonwealth, and the defendant's attorney, or the defendant if unrepresented" from "attempt[ing] to read any notes." **Id.** at (A)(3). Rule 644 also provides that a trial judge "must instruct the jurors concerning the note taking" and "sets forth the minimum information the judge must explain to the jurors" about taking notes. **Id.** at 644(B) & cmt.

Rule 646 sets forth the materials that are permitted to be in the possession of the jury during deliberations. **See** Pa.R.Crim.P. 646. Pursuant to Rule 646, "jurors shall be permitted to have their notes for use during deliberations." **Id.** at 646(D). Rule 646 only bars the jury from having "a transcript of any trial testimony," "a copy of any written or otherwise recorded confession by the defendant," "a copy of the information or indictment," and, except as otherwise provided by the rule, "written jury instructions." **Id.** at 646(C). Other than those prohibited materials, the trial court may allow jurors to "take with [them] such exhibits as [it] deems proper." **Id.** at 646(A).

Here, Appellant does not challenge the trial court's decision to allow the jury to view the compilation video during deliberations. **See** Appellant's Brief at vii. Additionally, it was within the trial court's discretion to permit the jury to review a compilation video during deliberations. **See** Pa.R.Crim.P. 646(A); **see also Commonwealth v. Johnson**, 241 A.3d 398, 403 (Pa. Super. 2020) (stating that "[t]he decision to allow the jury to refresh their recollection by re-watching a video shown to them at trial is a matter within the discretion of

the trial court" (citation omitted)).  Further, it is clear that jurors may "use" their notes during deliberations.  **See** Pa.R.Crim.P. 644(A) & 646(D). Accordingly, we only consider if one of the permitted "uses" of a juror's notes is the taking of new notes during deliberations based upon exhibits permitted to be shown to the jury during those deliberations.

Inspecting the context of Rules 644 and 646, which allow jurors to "use" their notes during deliberations, is helpful in determining whether one of those permitted "uses" is taking new notes.  **See Kapellusch**, 323 A.3d at 846. Both Rules 644 and 646 allow jurors to "use" their notes in deliberations.  **See** Pa.R.Crim.P. 644(A) & 646(D).  Rule 646 also permits jurors to see certain evidence during deliberations.  **See** Pa.R.Crim.P. 646(A).  Rule 644 makes clear that no one involved in the proceedings is permitted to attempt to read the jurors' notes and that the notes must be destroyed by the court "without inspection" after the jury is discharged.  **See** Pa.R.Crim.P. 644(A)(3), (7).

Because jurors are permitted to "use" their notes during deliberation, are permitted to inspect certain evidence during deliberations, and neither the court nor the parties to the case are permitted to review the jurors' notes after deliberation, the context of the rule suggests that jurors may take notes during deliberation and, if they take notes during deliberations, that "use" would go unrecognized.  In the instant case, the issue of whether the jury was permitted to take notes regarding a video compilation arose because of the practical limitations of playing a video for a jury.  Specifically, the fact that the jury viewed the compilation video outside of the deliberation room in the

courtroom. **See** N.T., 2/16/24, at 45-47 (reflecting that the trial court played the compilation video in the courtroom for the jury); N.T., 2/20/24, at 11-13 (same). Had the piece of evidence been a photo or other exhibit that the jury could inspect in the jury deliberation room, no court or party to the case would be able to determine whether the jurors' "use" of their notes included taking new notes because the court, prosecution, and defense are all barred from attempting to read the jurors' notes and those notes are destroyed "without inspection" upon the jury's discharge. Further, nothing in the rule suggests that jurors cannot take notes regarding permitted materials sent into the jury deliberation room despite the fact that the rule makes it mandatory to instruct the jury about the proper use of their notes. **See** Pa.R.Crim.P. 644(B). None of the instructions a trial judge is required to give to the jury about the proper use of their notes bars the jurors from taking notes in the jury deliberation room. **See id.** Accordingly, we conclude that the rules of criminal procedure do not bar jurors from taking notes regarding materials they are permitted to view during deliberations, including compilation videos that are replayed for them pursuant to the rules of criminal procedure. **See Kapellusch**, 323 A.3d at 845-46. Therefore, no relief is due.

**Waived Claims**

In his remaining claims, Appellant argues that the trial court erred by improperly empaneling an alternate juror in violation of Pa.R.Crim.P. 645 and

that the trial court erred by admitting the compilation video without proper authentication. **See** Appellant's Brief at 4-12, 15-16.

Generally, issues not presented to the trial court are waived on appeal. **See** Pa.R.A.P. 302. In order to preserve a claim that the trial court violated Pa.R.Crim.P. 645 when empaneling an alternate juror, a defendant must preserve the issue with a timely objection. **See Commonwealth v. Nieves**, 1257 EDA 2019, 2020 WL 6608876, at *3 (Pa. Super. filed Nov. 12, 2020) (unpublished mem.) (finding claims that the trial court erred by "failing to conduct a sufficient colloquy" of an alternate juror and "failing to properly instruct the reconstituted jury with respect to the removal of" the principal juror in accordance with Pa.R.Crim.P. 645(c) waived for failure to object).

Additionally, to preserve an evidentiary challenge for appellate review, a defendant must raise a contemporaneous objection at trial. **See Commonwealth v. Thoeun Tha**, 64 A.3d 704, 713 (Pa. Super. 2013) (citation omitted). The failure to object to authenticity under Pa.R.E. 901 at trial results in waiver of that claim on appeal. **See Folger ex rel. Folger v. Dugan**, 876 A.2d 1049, 1055 (Pa. Super. 2005); **Commonwealth v. Timms**, 115 WDA 2021, 2022 WL 628634, at *3 (Pa. Super. filed Mar. 4, 2022) (unpublished mem.) (applying waiver for failure to object to authenticity in a criminal case). To be timely, an evidentiary objection must be made before the evidence has been admitted into evidence and published to the jury. **See Commonwealth v. Winkelman**, 608 WDA 2022, 2023 WL 3092770, at *3 (Pa. Super. filed Apr. 26, 2023) (unpublished mem.).

### Empanelment of Alternate Juror

A review of the record confirms that trial counsel failed to make any objection to the empaneling of the alternate juror. *See* N.T., 2/20/24, at 3-6. Accordingly, Appellant's claim regarding the trial court's empaneling of an alternate juror is waived. *See Nieves*, 2020 WL 6608876, at *3; *see also* Pa.R.A.P. 302.

### Authenticity Claim

The record also reflects that Appellant failed to object before the compilation video was admitted into evidence and played for the jury. *See Winkelman*, 2023 WL 3092770, at *3. On the first day of trial, the Commonwealth presented the compilation video while video expert Detective Kert Wilson was on the stand. *See* N.T., 2/13/24, at 91, 98-112. The video was played in its entirety as Detective Wilson provided accompanying testimony. *Id.* at 99-108. Counsel did not object to the authenticity of the video at any point during Detective Wilson's testimony or the playing of the video compilation. *See id.* at 91-112. Two days later, during the testimony of Detective Craig Coulter, the Commonwealth sought to play the video compilation a second time. *See* N.T., 2/15/24, at 11, 26. Counsel requested a sidebar conference and challenged the authenticity of certain videos that made up the compilation video. *See id.* at 28-30. However, at that point, the video had already been admitted into evidence and published to the jury. Accordingly, Appellant's challenge to the authenticity of the compilation video

is waived.  *See Thoeun Tha*, 64 A.3d at 713; *Dugan*, 876 A.2d at 1055;

*Winkelman*, 2023 WL 3092770, at *3; Pa.R.A.P. 302.

Judgment of sentence affirmed.  Jurisdiction relinquished.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 11/24/2025